

# BSK

---

# EROSION CONTROL PLAN

**Wireless Telecommunications Site
Palomar Park
SF33XC598B
1175 Palomar Drive
Redwood City, California**

**BSK 01-40-0767-03**

*Submitted to*

**Alvar Architects, Inc.
Dublin, California**

**RESUBMITTAL**

NOV 3 0 2000

BUILDING INSPECTION

**November 21, 2000**

---

**Engineers, Geologists, Environmental Scientists**

BLD2000- 01628    AR 0121

# BSK

567 W. Shaw Ave. Ste. B
Fresno, CA 93704
(559) 497-2880
FAX (559) 497-2886

**VIA FEDERAL EXPRESS**

November 21, 2000                                    **BSK  01-40-0767-03**

Ms. Teri Arana, Project Coordinator
**ALVAR ARCHITECTS, INC.**
6690 Amador Plaza
Dublin CA, 94658

> **SUBJECT:**   **Erosion Control Plan**
> **Wireless Telecommunications Site**
> **Palomar Park**
> **SF33XC598B**
> **1175 Palomar Drive - Redwood City, California**

Dear Ms. Arana:

BSK & Associates (BSK) has prepared the Erosion Control Plan (ECP) for the subject project for Alvar Architects, Inc. (Client), consultant to Sprint PCS (System Owner). The ECP was prepared in accordance with the scope of services presented in BSK's Proposal 01-40-0767-03, dated November 9, 2000, which you authorized on November 10, 2000. The ECP has been prepared for your submittal to, and approval by, the County of San Mateo, Planning and Building Division (County) prior to construction as required by the County's "Recommended Findings and Conditions of Approval," No. PLN 2000-00497.

A copy of the ECP is to remain available at the site during construction activities for review by overseeing agencies, the public, and for use by the workers. We appreciate this opportunity to be of service. Please call if you have questions.

Respectfully submitted,
**BSK & ASSOCIATES**


C. Scott Smith, P.E.                        Ralph T. Boyajian, P.E.
Senior Environmental Engineer               Principal Engineer

CSS/RTB/clh

Enclosure:   ECP

Distribution:   Client (3 originals)
                BSK File 310 (1 original)

J:\40\00\0767 Alvar SWPPPs\03 Palomar Pk\Report.wpd

**AR  0122**

*A California Corporation*

Geotechnical Engineering ● Engineering Geology ● Environmental Services ● Construction Inspection & Testing ● Analytical Testing

## TABLE OF CONTENTS

1.0    PROJECT INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.0    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.1    Report Organization  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.2    Objective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.3    Project Plans And Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.4    Project Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.5    Project Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.6    Project Time Frames . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.7    Project Setting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        2.7.1    Land Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        2.7.2    Topography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        2.7.3    Soils . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        2.7.4    Surface Waters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.7.5    Precipitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.0    EROSION CONTROL MEASURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.1    Soil Stabilization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.2    Soil-Disturbing Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.3    Sediment Runoff Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.4    Sediment Tracking Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4.0    OTHER POTENTIAL SOURCES OF POLLUTION . . . . . . . . . . . . . . . . . . . . . 7

5.0    AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6.0    LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## FIGURES

Figure 1        Vicinity Map
Figure 2        Topographic Map
Figure 3        Site Plan
Figure 4        Site Elevations Map

## APPENDICES

Appendix A    Best Management Practices
Appendix B    ECP Amendment Log

AR 0123



**EROSION CONTROL PLAN**
**WIRELESS TELECOMMUNICATIONS SITE**
**PALOMAR PARK**
**SF33XC598B**
**1175 PALOMAR DRIVE, REDWOOD CITY, CALIFORNIA**

## 1.0    PROJECT INFORMATION

*Project Name:*

Wireless Telecommunications Site
Palomar Park
SF33XC598B
1175 Palomar Drive
Redwood City, California

*Architect*:

Alvar Architects, Inc.
6690 Amador Plaza
Dublin CA, 94658
Contact:  Ms.  Teri Arana
　　　　(925) 875-9288

*Contractor:*

A construction contractor will be selected by Sprint PCS.  That contractor will designate a contractor representative who is responsible for ECP implementation. The phone number for that representative should be provided to the County in the event the County has questions regarding ECP implementation.

*Preparer of ECP:*

BSK & Associates
567 West Shaw, Ste. B
Fresno, CA 93704
Contact:  C.  Scott Smith, P.E.
　　　　(559) 497-2880, ext.  106

**AR 0124**



## 2.0    INTRODUCTION

### 2.1    Report Organization

This ECP was prepared to address applicable requirements of the County of San Mateo, Planning and Building Division (County) contained in the "Recommended Findings and Conditions of Approval", No. PLN 2000-00497. The ECP was prepared in recognition of the following documents, where applicable:

- Storm Drain Pollution Prevention Pamphlets San Mateo Countywide Storm Water Pollution Prevention Program (STOPPP)

- Guidelines for Construction Projects Proposed Framework for the SWPPP, California Regional Water Quality Control Board, San Francisco Bay Region

- Erosion and Sediment Control Field Manual, California Regional Water Quality Control Board, San Francisco Bay Region

- California Storm Water Management Practice Handbook, Construction Activity, Storm Water Quality Task Force

### 2.2    Objective

The objective of the ECP is to identify sources of sediment and other pollutants that can potentially affect the quality of runoff from the project route during construction and to describe best management practices (BMPs) to reduce sediment and other pollutants in runoff.

The preparation of this ECP is based on the principles of Best Management Practices, as opposed to numeric effluent limitations, to control and abate the discharge of pollutants into surface water courses. BMPs to be implemented are listed within Section 3 and narrative descriptions of the BMPs are contained in Appendix A.

### 2.3    Project Plans And Specifications

The plans and specifications for the project are maintained at the offices of Alvar Architects, Inc., in Dublin California.

**AR 0125**



## 2.4    Project Location

The site is located at 1175 Palomar Drive (also occupied by a single-family residence) on the western outskirts of Redwood City, California (Figure 1, Vicinity Map, and Figure 2, Topographic Map).

## 2.5    Project Description

The project consists of the installation of antennas, associated equipment cabinets, and underground utilities for wireless telecommunications services (Sprint Spectrum's Personal Communication Services). Components of the project are shown on Figure 3, Site Plan, and include three pole-mounted sectors, five equipment cabinets, an underground coax cable, an underground conduit, an emergency generator receptacle conduit, and underground power & telco line. Small concrete pads will be constructed in some areas. Areas of construction activity comprise about 300 square feet.

## 2.6    Project Time Frames

The project is anticipated to be completed within 45 days of receipt of the construction permit, which is anticipated to be received in early December 2000.

## 2.7    Project Setting

### 2.7.1   Land Use

The site is located on the lot of a single-family residence, in a residential area on the west side of Palomar Drive.

### 2.7.2   Topography

The topography of the site and vicinity is hilly (Figure 2). The site is atop hillside which generally slopes downward away from the site to the south (Figure 4, Site Ground Surface Elevations Map). Drainage from the project area is toward the hillside and the average elevation of the project area is approximately 542 feet, USGS datum.

### 2.7.3   Soils

Shallow soils of the project area are classified as "Los Gatos sandy loam" *(Soil Survey of San Mateo County, Eastern Part, and San Francisco County* United States Department of Agriculture, Soil Conservation Service, September 1991). These soils formed in material weathered from hard, fractured sandstone. The surface layers consist of sandy and clayey loams and the hard sandstone typically occurs at a depth of 2 to 3 feet.

AR 0126



A geotechnical engineering investigation report for the project site was prepared by another consultant,(*Geotechnical Engineering Investigation, Proposed Communication Tower, 1175 Palomar Drive, Redwood City, California)* Krazan & Associates, Inc., in October 2000. The upper approximately 1½ feet is reportedly comprised of fill (gravelly clay). The fill was observed to be underlain by dense, weathered sandstone and mudstone to a depth of about 2½ feet, at which depth equipment refusal (a backhoe) was encountered.

### 2.7.4  Surface Waters
Cordilleras Creek, an east-trending ephemeral stream channel, is located about ¼-mile south of the site (Figure 2). The Creek flows toward the San Francisco Bay which is located about 6 miles east of the site. No other surface water bodies or courses are located with ½-mile of the site.

### 2.7.5  Precipitation
Summarized on Table 1 are reported monthly average precipitations for Redwood City, California for the 30-year period 1961 to 1990.

**TABLE 1**
**Average Monthly Precipitation**
**Redwood City, California**
**(1961 to 1990)**

| Month | Average Precipitation (Inches) |
|---|---|
| November | 2.87 |
| December | 3.24 |
| January | 4.18 |

<u>Source</u>:  National Weather Services Climatological Data,
San Francisco Bay Area

## 3.0        EROSION CONTROL MEASURES
The principal source of potential water quality impact is erosion evolved sediment. BMPs for erosion and sediment control will be implemented over the duration of the project and where appropriate (as in the case of fiber rolls), through mid-April 2001.

**AR  0127**



## 3.1    Soil Stabilization

Ground cover, forbs, and trees occur over the project area. Due to the nature of the project, a minimal area will be disturbed. Therefore, mulching, or the use of geotextiles, erosion control blankets, or other soil stabilization practices is not warranted.

Trenches will be backfilled with site soils and compacted with light equipment. Excess soils, if applicable, will be spread within the project area and not to exceed a depth of 6 inches.

Equipment travel will be conducted over designated areas to minimize injury to vegetation in general accordance with the following BMP:

*Preservation of Existing Vegetation        ESC2*

Upon project completion, areas subjected to grubbing, grading, or trenching will be re-vegetated through seeding, planting, or transplanting. Grading and trenching plans have been designed with the intention of minimizing the disturbance of tree roots to the degree practical. Seeding and planting of grasses, forbs, and shrubs will be in general accordance with the following BMP.

*Seeding and Planting        ESC10*

## 3.2    Soil-Disturbing Activities

Soil-disturbing activities will be limited to grading over a small area for equipment installation and to narrow trenching for underground lines. Grubbing, where required, will be limited to these same areas. In the event of a storm event (including forecasted events), exposed or stockpiled soil will be entirely covered with a tarp, sheet plastic, or other durable water-proof materials and anchored by brick, sand bags or other materials not subject to erosion.

Grading and trenching activities will be scheduled around forecasted storm events to minimize the potential for transport of sediment from the site in general accordance with the following BMP.

*Scheduling                        ESC1*

ECP - 1175 Palomar Dr.                    5                    BSK 01-40-0767-03
Redwood City, CA                                            November 21, 2000

**AR 0128**



### 3.3    Sediment Runoff Control

No grated drain inlets, drop drains, or slope drains occur within, or immediately downgradient, of the project area. In order to minimize the quantity of sediment transported offsite in runoff from the project area, fiber rolls will be placed in areas immediately downslope of construction activities. The approximate areas where fiber rolls will be placed are shown on Figure 3. The fiber rolls will be placed such that a consistent elevation is maintained. The roll will be entrenched such that about 4 inches is placed below the natural ground surface and stakes will be driven on the downslope side of the rolls to minimize travel.

The fiber rolls will be inspected on a daily basis through project completion and will remain in place until mid-April 2000. Damage sections will be repaired or replaced as needed to function properly.

### 3.4    Sediment Tracking Controls

The potential for tracking of sediment from construction-related vehicles is limited to site egress at the residence driveway connecting to Palomar Drive, as shown on Figure 4. Sediment tracking from the site onto Palomar Drive will be minimized through washing off of the tires containing excessive sediment from contractors' equipment before exiting the site.

### 4.0    OTHER POTENTIAL SOURCES OF POLLUTION

In order to minimize the potential for release of other potential sources of water quality impairment from during the construction activities, the following practices will be implemented:

-    Delivery and storage of construction materials and paint will be in general accordance with the following BMP.

    *Materials Delivery and Storage*          *CA10*

-    Waste concrete will be managed in general accordance with the following BMP.

    *Concrete Waste Management*          *CA23*

ECP - 1175 Palomar Dr.                          6                     BSK 01-40-0767-03
Redwood City, CA                                                     November 21, 2000

**AR 0129**



- No equipment or other vehicle fueling or maintenance will occur on-site.

- Paint will not be applied to exterior surfaces within 24 hours of a forecasted storm event or during any storm event.

- Solids wastes will be placed in designated receptacles and removed from the site following project completion and/or hand-carried from the site at the conclusion of each work day.

## 5.0    AMENDMENTS

This ECP will be amended whenever there is a change in construction or operations that may affect the discharge of significant quantities of sediment from the project area or if a given BMP has not achieved the objective of reducing sediment in storm water runoff from the project area. Appendix B contains an ECP Amendment Log for use in documentation of changes including the basis for the change.

## 6.0        LIMITATIONS

This Plan has been prepared for Alvar Architects, Inc. as a public document for the subject project. This Plan has been prepared in accordance with generally accepted methodologies and engineering practice in the project area at this time. The information presented in this Plan is valid as of the present. The passage of time, natural processes or human intervention and changes in Federal and State environmental regulations can cause conditions that can invalidate the recommendations presented. Certain project-specific information presented in the Plan is based on information provided by Alvar Architects, Inc. BSK is not responsible for the accuracy of information provided by others.

BSK & Associates

AR 0130





FIGURE 1
BSK 01-40-0767-03
NOVEMBER 2000

1175 Palomar Drive
Redwood City, CA 94062

VICINITY MAP
EROSION CONTROL PLAN
WIRELESS TELECOMMUNICATIONS SITE
PALOMARPARK
SF33XC59B
1175 PALOMARDRIVE
REDWOODCITY, CALIFORNIA

N

SCALE: 1 INCH = 1 MILE

BSK

AR 0131



FIGURE 2
BSK 01-40-0767-03
NOVEMBER 2000

**TOPOGRAPHIC MAP**
EROSION CONTROL PLAN
WIRELESS TELECOMMUNICATIONS SITE
1175 PALOMAR DRIVE
REDWOOD CITY, CALIFORNIA

SCALE: 1 INCH = 1,000 FEET

N

REFERENCE: USGS 7½-Minute
Quadrange, Woodside, California, 1981

BSK

AR 0132



ENLARGED SITE PLAN

AR 0133

FIGURE 4
BSK 01-40-0767-03
NOVEMBER 2000



REFERENCE: 1175 Palomar Dr.,
Thompson - Hysell Engineers,
October 2000

**BSK**

## OUND SURFACE ELEVATIONS
### EROSION CONTROL PLAN
.ESS TELECOMMUNICATIONS SITE
### PALOMARPARK
#### SF33XC59B
### 1175 PALOMARDRIVE
REDWOODCITY, CALIFORNIA

AR 0134

# APPENDIX A

## Best Management Practices

AR 0135



**BMP:** SCHEDULING



### Objectives

( Housekeeping Practices )
( Contain Waste )
( Minimize Disturbed Areas )
( Stabilize Disturbed Areas )
( Protect Slopes/Channels )
( Control Site Perimeter )
( Control Internal Erosion )

### DESCRIPTION

Sequencing the construction project to reduce the amount and duration of soil exposed to erosion by wind, rain, runoff, and vehicle tracking.

### SUITABLE APPLICATIONS

Proper sequencing of construction activities to reduce erosion potential should be incorporated into the schedule of every construction project. Use of other, more costly yet less effective, erosion and sedimentation controls, may often be reduced through proper construction sequencing.

### APPROACH

- Project design considerations: Design project to integrate into existing land contours. Significant regrading of a site will require more costly erosion and sedimentation control measures and may require that on-site drainage facilities be installed.

- Incorporate existing, natural areas: Inventory and evaluate the existing site terrain and vegetation. Disturbance of highly erosive natural areas (e.g., steep, unstable slope areas, watercourses) should be minimized, while protecting other areas may enhance site aesthetics. Construction should not disturb these areas (see ESC2).

- Avoid rainy periods: Schedule major grading operations during dry months. Allow enough time before rainfall begins to stabilize the soil with vegetation or physical means (see ESC 10 to 24) or to install temporary sediment trapping devices (see ESC 50 to 56).

- Practice erosion and sediment control year round: Erosion may be caused during dry seasons by "freak" rainfall, wind and vehicle tracking. Therefore, keep the site stabilized year-round, and retain wet season sediment trapping devices.

- Minimize soil exposed at one time: Schedule projects to disturb only small portions of the site at any one time. Complete grading as soon as possible. Immediately stabilize the disturbed portion before grading the next portion. Practice staged seeding—revegetate cut and fill slopes as the work progresses.

- Trenching: Close and stabilize open trenches as soon as possible. Sequence trenching projects so that most open portions of the trench are closed before new trenching is begun.

### REQUIREMENTS

- Cost
  - Construction scheduling to reduce erosion may increase other construction costs due to reduced economies of scale in performing site grading. The cost-effectiveness of scheduling techniques should be compared with the other, less effective erosion and sedimentation controls to achieve a cost-effective balance.

### Targeted Pollutants

- ○ Sediment
- ○ Nutrients
- ○ Toxic Materials
- ○ Oil & Grease
- ○ Floatable Materials
- ○ Other Construction Waste

- ● Likely to Have Significant Impact
- ○ Probable Low or Unknown Impact

### Implementation Requirements

- ○ Capital Costs
- ○ O&M Costs
- ○ Maintenance
- ○ Training
- ○ Suitibility for Slopes >5%

| ● High | ○ Low |

## ESC1



**Best Management Practices**

# BMP: SCHEDULING ( Continue)

**LIMITATIONS**
There are no significant limitations to the use of this BMP.

**REFERENCES**
Best Management Practices and Erosion Control Manual for Construction Sites, Flood Control District of Maricopa County, Arizona - 1992.

Erosion and Sediment Control Guidelines for Developing Areas in Texas, U.S. Department of Agriculture, Soil Conservation Service, Fort Worth, Texas - 1976.

Storm Water Management for Construction Activites. Developing Pollution Prevention Plans and Best Management Practices, U.S. Environmental Protection Agency, Office of Water (EPA 832-R-92-005) - September, 1992.

Virginia Erosion and Sediment Control Handbook, Third Edition, Virginia Department of Conservation and Recreation, Division of Soil and Water Conservation - 1992.

| ESC1 |
| --- |



# BMP: PRESERVATION OF EXISTING VEGETATION

**Objectives**

Housekeeping Practices

Contain Waste

Minimize Disturbed Areas

Stabilize Disturbed Areas

Protect Slopes/Channels

Control Site Perimeter

Control Internal Erosion

## GENERAL DESCRIPTION
Carefully planned preservation of existing vegetation minimizes the potential of removing or injuring existing trees, vines, shrubs and/or grasses that serve as erosion controls.

## SUITABLE APPLICATIONS
- Areas within site where no construction activity occurs, or occurs at a later date.
- Sensitive areas where natural vegetation exist and should be preserved, such as: steep slopes, watercourses, and building sites in wooded areas.
- Areas where local, state and federal government requires preservation, such as: vernal pools, wetlands, marshes, certain oak trees, etc.

## INSTALLATION/APPLICATION CRITERIA
- Clearly mark, flag or fence vegetation or areas where vegetation should be preserved.
- Prepare landscaping plans which include as much existing vegetation as possible and state proper care of this vegetation both during and after construction.
- Define and protect with berms, fencing, signs, etc., a setback area from vegetation to be preserved. Setback area size should be based on the location, species, size, age and potential impact of adjacent construction activities or permanent improvements.
- Proposed landscaping plans which do not include plant species that compete with the existing vegetation.
- Do not locate construction traffic routes, spoil piles, etc., where significant adverse impact on existing vegetation may occur.

## REQUIREMENTS
- Maintenance
  - Inspection and maintenance requirements for protection of vegetation are low.
  - During construction the limits of grading or disturbance should be clearly marked at all times.
  - Irrigation or maintenance of native trees or vegetation should conform to specifications on the Landscape Plan.
- Cost
  - There is little cost associated with preserving existing vegetation if properly planned during the project design, and may yield aesthetic benefits which enhance property values.

## LIMITATIONS
- Requires forward planning by the owner/developer, contractor and design staff.
- For sites with diverse topography, it is often difficult and expensive to save existing trees while grading the site satisfactorily for the planned development.

**Targeted Pollutants**

- ● Sediment
- ○ Nutrients
- ○ Toxic Materials
- ○ Oil & Grease
- ○ Floatable Materials
- ○ Other Construction Waste

- ● Likely to Have Significant Impact
- ○ Probable Low or Unknown Impact

**Implementation Requirements**

- ○ Capital Costs
- ○ O&M Costs
- ○ Maintenance
- ○ Training
- ● Suitability for Slopes >5%

● High   ○ Low

# ESC2



Best Management Practices

5 - 7

AR 0138

# Additional Information — Preservation of Existing Vegetation

The best way to prevent excessive erosion is to not disturb the land. On a construction site, where extensive land disturbance is necessary, a reasonable BMP would be to not disturb land in sensitive areas of the site which need not be altered for the project to be viable (e.g., natural watercourses, steep slopes), and to design the site to incorporate particularly unique or desireable existing vegetation into the site landscaping plan. Clearly marking and leaving a buffer area around these unique areas will both help to preserve these areas as well as take advantage of natural erosion prevention and sediment trapping in naturally vegetated areas.

Existing vegetation to be preserved on the site must be protected from mechanical and other injury while the land is being developed. The purpose of protecting existing vegetation is to insure the survival of desirable vegetation for shade, beautification, and erosion protection. Mature vegetation has extensive root systems that help to hold soil in place, thus reducing erosion. Also, vegetation helps to keep soil from drying rapidly and becoming susceptible to erosion. To effectively save existing vegetation, no disturbances of any kind should be allowed within a defined area around the vegetation. For trees, no construction activity should occur within the drip line of the tree.

The following criteria may be used for deciding which vegetation will remain on the site:
- Aesthetic values: Consideration should be given to foliage, flowering habits, bark and crown characteristics (for trees).
- Freedom from disease and rot.
- Life span of trees: Short-lived trees need not be preserved.
- Environmental values: Habitat; screening; and buffers.
- Sudden exposure: Save vegetation which grows in direct sunlight and is able to withstand radiated heat from proposed buildings and pavement.
- Space needed: Sufficient space must be provided between the vegetation and any structures, electric and telephone lines, water and sewer lines, driveways and streets. Mark trees and shrubs with bright paint or ribbon so there is no doubt as to which trees and shrubs are to be left and protected from damage during construction.

Saving existing vegetation and mature trees on-site, beautifies the area and may save money by reducing new landscaping requirements. Mature trees also increase property values and satisfy consumer aesthetic needs.

Preserving and protecting existing vegetation can often result in more stable soil conditions during construction. Careful site planning and identification of plantings to preserve can provide erosion and sedimentation controls during construction, and contribute to the aesthetics of the development. For example, in Sacramento County a tree ordinance has been adopted that protects the native California Oak tree. Provisions to protect the tree and its root system during construction must be specified in the project plans, and an area must be provided where the soil stability may not be disturbed. No grading or construction storage within the tree dripline is allowed.

<u>Installation/Application</u>
Building sites may be planned to integrate existing vegetation and trees. Construction impacts must be considered. Trench width for pipe construction projects and the location of permanent structures, such as buildings, needs to be considered when preserving existing vegetation, including mature trees and their root system. Native vegetation should be preserved since it is able to adapt to the climate. The USDA Soil Conservation Service should be contacted about existing vegetation for sites throughout California. Mature trees are generally preferable to newly planted trees because of the greater soil stabilization provided by the extensive root system of a mature tree.

| ESC2 |
| --- |



Best Management Practices

## Additional Information — Preservation of Existing Vegetation

Methods for protecting existing vegetation and trees:

- Stake off root system limits (drip line of tree).  Some counties limit construction within 5 feet of the tree drip line.
- Fence off the area to be preserved or along the tree drip line.
- Flag or mark trees to remain in place.
- Tree wells and retaining walls (permanent) help preserve existing vegetation, but must be large enough to protect the root system (see below).
- For the California Oak tree, no trenching or irrigation should be allowed within the driplines of the tree, since both these activities are detrimental to the preservation of the tree.
- Where grading under trees is necessary, excavation and fill should be limited to 1 foot within the driplines.

**REFERENCES**

Best Management Practices and Erosion Control Manual for Construction Sites, Flood Control District of Maricopa County, Arizona, September 1992.

County of Sacramento Tree Preservation Ordinance - September 1981.

Stormwater Management Water for the Puget Sound Basin, Washington State Department of Ecology, The Technical Manual - February 1992, Publication # 91-75.

Water Quality Management Plan for the Lake Tahoe Region, Volume II, Handbook of Management Practices, Tahoe Regional Planning Agency - November 1988.

ESC2

Best Management Practices

# BMP: SEEDING AND PLANTING



## Objectives

Housekeeping Practices

Contain Waste

Minimize Disturbed Areas

*(Stabilize Disturbed Areas)*

*(Protect Slopes/Channels)*

Control Site Perimeter

Control Internal Erosion

## GENERAL DESCRIPTION

Seeding of grasses and plantings of trees, shrubs, vines and ground covers provide long-term stabilization of soil. In some areas, with suitable climates, grasses can be planted for temporary stabilization.

## SUITABLE APPLICATIONS

- Appropriate for site stabilization both during construction and post-construction.
- Any graded/cleared areas where construction activities have ceased.
- Open space cut and fill areas.
- Steep slopes.
- Spoil piles.
- Vegetated swales.
- Landscape corridors.
- Stream banks.

## INSTALLATION/APPLICATION CRITERIA

Type of vegetation, site and seedbed preparation, planting time, fertilization and water requirements should be considered for each application.

Grasses:
- Ground preparation:  fertilize and mechanically stabilize the soil.
- Tolerant of short-term temperature extremes and waterlogged soil conditions.
- Appropriate soil conditions:  shallow soil base, good drainage, slope 2:1 or flatter.
- Develop well and quickly from seeds.
- Mowing, irrigating, and fertilizing are vital for promoting vigorous grass growth.

Trees and Shrubs:
- Selection Criteria:  vigor, species, size, shape & wildlife food source.
- Soil conditions: select species appropriate for soil, drainage & acidity.
- Other Factors: wind/exposure, temperature extremes, and irrigation needs.

Vines and Ground Covers:
- Ground preparation: lime and fertilizer preparation.
- Use proper seeding rates.
- Appropriate soil conditions: drainage, acidity, slopes.
- Generally avoid species requiring irrigation.

## Targeted Pollutants

- ● Sediment
- ◐ Nutrients
- ◐ Toxic Materials
- ○ Oil & Grease
- ○ Floatable Materials
- ○ Other Construction Waste

- ● Likely to Have Significant Impact
- ○ Probable Low or Unknown Impact

## Implementation Requirements

- ◐ Capital Costs
- ◐ O&M Costs
- ◐ Maintenance
- ◐ Training
- ◐ Suitability for Slopes >5%

- ● High  ○ Low

## ESC10



Best Management Practices

## BMP: SEEDING AND PLANTING (Continue)

**REQUIREMENTS**

- Maintenance
    - Shrubs and trees must be adequately watered and fertilized and if needed pruned.
    - Grasses may need to be watered and mowed.
- Cost: Average annual cost for installation and maintenance (2 year useful life, source: EPA, 1992)
    - Seeding: $300 per acre, appropriate for flat slopes and stable soils.
    - Seeding with Mulching: $1,100 per acre, appropriate for moderate to steep slopes and/or erosive soils.
    - Trees, shrubs, vines, and ground cover: Cost, applicability based on species used and terrain features.

**LIMITATIONS**

- Permanent and temporary vegetation may not be appropriate in dry periods without irrigation.
- Fertilizer requirements may have potential to create storm water pollution if improperly applied.

ESC10

Best Management Practices

# Additional Information — Seeding and Planting

Permanent seeding of grasses, sodding, and planting of trees, shrubs, vines and ground covers can provide long-term stabilization of soil. Permanent seeding and planting contributes to long-term site aesthetics and helps reduce erosion by reducing the velocity of runoff, allowing infiltration to occur, filtering sediments, and by holding soil particles in place.

Seeding and planting should be applied as soon as final grading is done to all graded and cleared areas of the construction site where plant cover is ultimately desired. For example, vegetation may be established along landscaped corridors and buffer zones where they may act as filter strips (see TC6 in Chapter 5 of the Municipal Handbook). Additionally, vegetated swales, steep and/or rocky slopes and stream banks can also serve as appropriate areas for seeding and plantings.

<u>Installation/Application Criteria</u>
Application of appropriate vegetation must consider: the seedbed or plantbed, proper seasonal planting times, water requirements fertilizer requirements and availability of the selected vegetation within the project's region. Permanent plantings during the construction stage of projects require careful coordination between the local agency inspectors, project managers, construction managers, and landscape contractor. Protocols for coordination and implementation procedures regarding site access, construction staging, and short- and long-term planting areas should be developed prior to the construction bid process. Where possible, these protocols should be established by and remain the responsibility of the site owner.

Because of the many available types of plants and ground covers and because site conditions and land use vary so widely within California, a set of general guidelines is included for installation/application of grasses, trees and shrubs, vines and ground covers. However, your local municipality, Soil Conservation Service, agricultural extention, or other resources should be consulted on appropriate species, planting requirements, and maintenance needs for your climate and soils.

**Grasses**

Grasses, depending on the type, provide short-term soil stabilization during construction or can serve as long- term/permanent soil stabilization for disturbed areas. In general, grasses provide low maintenance to areas that have been cleared, graded and mechanically stabilized.

<u>Selection:</u>
The selection of the grass type is determined by the climate, irrigation, mowing frequency, maintenance effort and soil-bed conditions. Although grasses provide quick germination and rapid growth, they also have a shallow root system and are not as effective in stabilizing deep soils, where trees, shrubs and deep rooted ground covers may be more appropriate. Several grasses are adaptable to the various California climates. The figure at the end of these fact sheets shows appropriate grasses for regions within California. Blue grass is well adapted throughout California except for in the valley regions. The blue grass is found on dry, sandy soils that have good drainage. Bermuda grass, on the other hand is well adapted in the valley region where soils are dry, coarse and heavier. Specific seed mix and/or varieties for each site should be provided by an approved/qualified plant materials specialist.



ESC10

Best
Management
Practices

# Additional Information — Seeding and Planting

Planting:
The following steps should be followed to ensure established growth:
1.  Select the proper grass for the site.
2.  Prepare the seedbed; soil should be fertilized and contain good topsoil or soil at least a 2:1 or flatter slope.
3.  Broadcast the seedings in the late fall or early spring. In the late fall, seedings should be planted by mid- September to have established grass by the October rainy season.
4.  Initial irrigation will be required often for most grasses, with follow-up irrigation and fertilization as needed. Mulching may be required in dry climates or during drought years.

## Trees & Shrubs

Selection:
Trees and shrubs, when properly selected, are low maintenance plantings that stabilize adjacent soils, moderate the adjacent temperatures, filter air pollutants, and serve as a barrier to wind. Some desirable characteristics to consider in selecting trees and shrubs include: vigor, species, age, size and shape, and use as a wildlife food source and habitat.

Trees and shrubs to be saved should be clearly marked so that no construction activity will take place within the dripline of the plant. The sites for new plantings should be evaluated. Consider the prior use of the land: adverse soil conditions such as poor drainage or acidity; exposure to wind; temperature extremes; location of utilities, paved areas, and security lighting and traffic problems.

Transplanting:
Time of Year - Late fall through winter (November to February) is the preferred time for transplanting in most of California.

Preparation - Proper digging of a tree/shrub includes the conservation of as much of the root system as possible. Soil adhering to the roots should be damp when the tree is dug, and kept moist until re-planting. The soil ball should be 12 inches in diameter for each inch of diameter of the trunk.

Site preparation - Refer to landscape plans and specifications for site and soil preparation, and for ability to coordinate construction strategy with permanent vegetation.

Supporting the trunk - Many newly planted trees/shrubs need artificial support to prevent excessive swaying.

Watering - Soil around the tree should be thoroughly watered after the tree is set in place. When the soil becomes dry, the tree should be watered deeply, but not often. Mulching around the base of the tree is helpful in preventing roots from drying out.

## Vines & Ground Covers

Selection:
Vines, ground covers, and low growing plants, that can quickly spread, come in many types, colors, and growth habits. Some are suitable only as part of a small maintained landscape area, while some can stabilize large areas with little maintenance. Flowers, which provide little long-term erosion control may be planted to add color and varietal appearances.

ESC10

Best
Management
Practices

# Additional Information — Seeding and Planting

Caution should be exercised in the non-native vegetation because of impacts to native vegetation on adjacent lands. For example, species that may be planted at the construction site can quickly spread and compete with originally undisturbed vegetation such as the California Poppy and California buckwheat, both of which complete poorly with introduced grasses (e.g., planting wild oats is illegal in California). In addition to stabilizing disturbed soil, vines and ground covers can perform the following functions:

1. Provide attractive cover that does not need mowing.
2. Help to define traffic areas and control pedestrian movement.

Site Preparation:
Ground covers are plants that naturally grow very close together, causing severe competition for space nutrients and water. Soil for ground covers should be well prepared. The entire area should be spaded, disced, or rototilled to a depth of six to eight inches. Two to three inches of organic material, such as good topsoil or peat, should be spread over the entire area.

Planting:
The following steps will help ensure good plant growth.

1. Make the plantings following the contours of the land.
2. Dig the holes 1/3 larger than the plant root ball.
3. Know what depth to place the plants.
4. Use good topsoil or soil mixture with a lot of organic matter.
5. Fill hole 1/3 to 1/2 full, shake plants to settle soil among roots, then water.
6. Leave saucer-shaped depression around the plant to hold water.
7. Water thoroughly and regularly.
8. Space plants according to the type of plant and the extent of covering desired.

Materials:
There are many different species of vines and ground covers from which to choose, but care must be taken in their selection. It is essential to select planting materials suited to both the intended use and specific site characteristics. The plants discussed in this handbook are those which are known to be adapted to California, and commonly available from commercial nurseries. Additional information can be obtained from local nurserymen, landscape architects, and extension agents. An approved low water use plant list may be obtained from the State Department of Water Resources or the Soils Conservation Service.

Requirements
Maintenance

General requirements include:
• Grass maintenance should be minimal to none. Irrigation and regular fertilizing may be required for some types of grasses. Mowing is only required in areas where aesthetics or fire hazards are a concern.
• Young trees should receive an inch of water each week for the first two years after planting. The tree should be watered deeply, but not more often than once per week.
• Transplanted trees should be fertilized on an annual basis.
• Proper pruning, watering, and application of fertilizer is necessary to maintain healthy and vigorous shrubs. A heavy layer of mulch applied around the shrubs reduces weeds and retains moisture.
• Trim old growth as needed to improve the appearance of ground covers. Most covers need once-a-year trimming to promote growth.



**ESC10**

Best Management Practices

**AR 0145**

# Additional Information — Seeding and Planting

<u>Limitations</u>

- Construction activities are likely to injure or kill trees unless adequate protective measures are taken. Direct contact by equipment is the most obvious problem, but damage is also caused by root stress from filling, excavation, or compacting too close to trees.
- Temporary seeding can only be viable when adequate time is available for plants to grow and establish.
- Over fertilizing of plants may cause pollution of storm water runoff.
- Irrigation source and supply may be limiting.

**REFERENCES**

Best Management Practices and Erosion Control Manual for Construction Sites, Flood Control District of Maricopa County, September 1992.

"Draft - Sedimentation and Erosion Control, An Inventory of Current Practices", U.S.E.P.A., April, 1990.

Guides for Erosion and Sediment Controls in California, USDA Soils Conservation Service - January 1991.

Kiowa Engineering, Interim Erosion and Sedimentation Control for Construction Activities, Urban Drainage and Flood Control District, Denver, Colorado.

Manual of Standards of Erosion and Sediment Control Measures, Association of Bay Area Governments, Jun 1981.

Proposed Guidance Specifying Management Measures for Sources of Nonpoint Pollution in Coastal Waters, Work Group Working Paper, USEPA, April, 1992.

Stormwater Management Water for the Puget Sound Basin, Washington State Department of Ecology, The Technical Manual - February 1992, Publication # 91-75.

Water Quality Management Plan for the Lake Tahoe Region, Volume II, Handbook of Management Practices, Tahoe Regional Planning Agency - November 1988.

**ESC10**

Best Management Practices

## ACTIVITY: MATERIAL DELIVERY AND STORAGE



### Objectives

- Housekeeping Practices
- Contain Waste
- Minimize Disturbed Areas
- Stabilize Disturbed Areas
- Protect Slopes/Channels
- Control Site Perimeter
- Control Internal Erosion

### DESCRIPTION

Prevent or reduce the discharge of pollutants to storm water from material delivery and storage by minimizing the storage of hazardous materials on-site, storing materials in a designated area, installing secondary containment, conducting regular inspections, and training employees and subcontractors.

This best management practice covers only material delivery and storage. For other information on materials, see CA11 (Material Use), or CA12 (Spill Prevention and Control). For information on wastes, see the waste management BMPs in this chapter.

### APPROACH

The following materials are commonly stored on construction sites:

- Soil,
- Pesticides and herbicides,
- Fertilizers,
- Detergents,
- Plaster or other products,
- Petroleum products such as fuel, oil, and grease, and
- Other hazardous chemicals such as acids, lime, glues, paints, solvents, and curing compounds.

Storage of these materials on-site can pose the following risks:

- Storm water pollution,
- Injury to workers or visitors,
- Groundwater pollution, and
- Soil contamination.

Therefore, the following steps should be taken to minimize your risk:

- Designate areas of the construction site for material delivery and storage.
  - Place near the construction entrances, away from waterways
  - Avoid transport near drainage paths or waterways
  - Surround with earth berms (see ESC30, Earth Dike.)
  - Place in an area which will be paved
- Storage of reactive, ignitable, or flammable liquids must comply with the fire codes of your area. Contact the local Fire Marshal to review site materials, quantities, and proposed storage area to determine specific requirements. See the Flammable and Combustible Liquid Code, NFPA30.
- For a quick reference on disposal alternatives for specific wastes, see Table 4.2, CA40, Employee/Subcontractor Training.
- Keep an accurate, up-to-date inventory of materials delivered and stored on-site.
- Keep your inventory down.

### Targeted Pollutants

- ◖ Sediment
- ◖ Nutrients
- ◖ Toxic Materials
- ◖ Oil & Grease
- ◖ Floatable Materials
- ○ Other Construction Waste

| | |
|---|---|
| ● | Likely to Have Significant Impact |
| ○ | Probable Low or Unknown Impact |

### Implementation Requirements

- ○ Capital Costs
- ○ O&M Costs
- ○ Maintenance
- ◖ Training
- ○ Suitability for Slopes >5%

| | | | |
|---|---|---|---|
| ● | High | ○ | Low |

## CA10

Best Management Practices

AR 0147

# ACTIVITY: MATERIAL DELIVERY AND STORAGE (Continue)

- Minimize hazardous materials on-site storage.
- Handle hazardous materials as infrequently as possible.
- During the rainy season, consider storing materials in a covered area. Store materials in secondary containments such as an earthen dike, horse trough; or even a children's wading pool for non-reactive materials such as detergents, oil, grease, and paints. Small amounts of material may be secondarily contained in "bus boy" trays or concrete mixing trays.
- Do not store chemicals, drums, or bagged materials directly on the ground. Place these items on a pallet and, when possible, in secondary containment.
- If drums must be kept uncovered, store them at a slight angle to reduce ponding of rainwater on the lids and to reduce corrosion.
- Try to keep chemicals in their original containers, and keep them well labeled.
- Train employees and subcontractors.
- Employees trained in emergency spill cleanup procedures should be present when dangerous materials or liquid chemicals are unloaded.
- If significant residual materials remain on the ground after construction is complete, properly remove materials and any contaminated soil (See CA22). If the area is to be paved, pave as soon as materials are removed to stabilize the soil.

## REQUIREMENTS
- Cost (Capital, O&M)
  - All of the above are low cost measures.
- Maintenance
  - Keep the designated storage area clean and well organized.
  - Conduct routine weekly inspections and check for external corrosion of material containers.
  - Keep an ample supply of spill cleanup materials near the storage area.

## LIMITATIONS
- Storage sheds often must meet building and fire code requirements.

## REFERENCES
Best Management Practices and Erosion Control Manual for Construction Sites; Flood Control District of Maricopa County, AZ, September 1992.

Blueprint for a Clean Bay-Construction-Related Industries: Best Management Practices for Storm Water Pollution Prevention; Santa Clara Valley Nonpoint Source Pollution Control Program, 1992; Santa Clara Valley Nonpoint Source Pollution Control Program, 1992.

Coastal Nonpoint Pollution Control Program: Program Development and Approval Guidance, Working Group Working Paper; USEPA, April 1992.

Storm Water Management for Construction Activities; Developing Pollution Prevention Plans and Best Management Practices, EPA 832-R-92005; USEPA, April 1992.

| CA10 |
| --- |



Best Management Practices



# ACTIVITY: CONCRETE WASTE MANAGEMENT



**Objectives**

Housekeeping Practices

*(Contain Waste)*

Minimize Disturbed Areas

Stabilize Disturbed Areas

Protect Slopes/Channels

Control Site Perimeter

Control Internal Erosion

## DESCRIPTION
Prevent or reduce the discharge of pollutants to storm water from concrete waste by conducting washout off-site, performing on-site washout in a designated area, and training employees and subcontractors.

## APPROACH
The following steps will help reduce storm water pollution from concrete wastes:
- Store dry and wet materials under cover, away from drainage areas.
- Avoid mixing excess amounts of fresh concrete or cement on-site.
- Perform washout of concrete trucks off site or in designated areas only.
- Do not wash out concrete trucks into storm drains, open ditches, streets, or streams.
- Do not allow excess concrete to be dumped on-site, except in designated areas.
- For on-site washout:
    - locate washout area at least 50 feet from storm drains, open ditches, or water bodies. Do not allow runoff from this area by constructing a temporary pit or bermed area large enough for liquid and solid waste;
    - wash out wastes into the temporary pit where the concrete can set, be broken up, and then disposed of properly.
- When washing concrete to remove fine particles and expose the aggregate, avoid creating runoff by draining the water to a bermed or level area.
- Do not wash sweepings from exposed aggregate concrete into the street or storm drain. Collect and return sweepings to aggregate base stock pile, or dispose in the trash.
- Train employees and subcontractors in proper concrete waste management.
- For a quick reference on disposal alternatives for specific wastes, see Table 4.2, CA40, Employee/Subcontractor Training.

## REQUIREMENTS
- Costs (Capital, O&M)
    - All of the above are low cost measures.
- Maintenance
    - Inspect subcontractors to ensure that concrete wastes are being properly managed.
    - If using a temporary pit, dispose hardened concrete on a regular basis.

## LIMITATIONS
- Off-site washout of concrete wastes may not always be possible.

**Targeted Pollutants**

○ Sediment
○ Nutrients
○ Toxic Materials
○ Oil & Grease
○ Floatable Materials
◑ Other Construction Waste

● Likely to Have Significant Impact
○ Probable Low or Unknown Impact

**Implementation Requirements**

○ Capital Costs
○ O&M Costs
◑ Maintenance
◑ Training
○ Suitability for Slopes >5%

● High    ○ Low

# CA23



Best Management Practices

## ACTIVITY: CONCRETE WASTE MANAGEMENT (Continue)

### REFERENCES

Best Management Practices and Erosion Control Manual for Construction Sites; Flood Control District of Maricopa County, AZ, July 1992.

Blueprint for a Clean Bay-Construction-Related Industries: Best Management Practices for Storm Water Pollution Prevention; Santa Clara Valley Nonpoint Source Pollution Control Program, 1992.

Storm Water Management for Construction Activities, Developing Pollution Prevention Plans and Best Management Practices, EPA 832-R-92005; USEPA, April 1992.

CA23


Best Management Practices

# APPENDIX B

# ECP Amendment Log

**AR  0151**





# ECP AMENDMENT LOG

| Date of Change | Person Implementing Change | Location of Change | Description of Change | Basis for Proposed Change |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

AR 0152





Landscape Site Plan

ATTACHMENT D

San Mateo County Planning Commission Meeting

Owner/Applicant: **Sprint**

File Numbers: **PLN 2000-00497**

AR 0154



# Vicinity Map

**San Mateo County Planning Commission Meeting**

Owner/Applicant: **Sprint**

File Numbers:    **PLN 2000-00497**

ATTACHMENT C

PROJECT PARCEL



## LARGE TREE PLANTING
N.T.S. 1

## LEGEND
N.T.S. 2

## TRENCHES
N.T.S. 3

## EMITTERS
N.T.S. 4

**San Mateo County Planning Commission Meeting**

Owner/Applicant: **Sprint**

File Numbers: **PLN 2000-00497**

Attachment:

AR 0156



**Southwest Elevation**

**Northwest Elevation**

## San Mateo County Planning Commission Meeting

Owner/Applicant: **Sprint**

File Numbers:    **PLN 2000-00497**

Attachment:

AR 0157

030



**Northeast Elevation**

**Southeast Elevation**

**San Mateo County Planning Commission Meeting**

Owner/Applicant: **Sprint**

File Numbers: **PLN 2000-00497**

Attachment:

AR 0158



# Enlarged Site Plan

Attachment:

## San Mateo County Planning Commission Meeting

Owner/Applicant: **Sprint**

File Numbers: **PLN 2000-00497**



San Mateo County Planning Commission Meeting

AR 0160

Attachment:

Applicant:

File Numbers:



AR 0161

San Mateo County Planning Commission Meeting

Applicant:

File Numbers:

Attachment:



AR 0162



AR 0163

San Mateo County Board of Supervisors' Meeting

Applicant:

File Numbers:

Attachment:



**Northeast Elevation**

**Southeast Elevation**

AR 0164

San Mateo County Board of Supervisors' Meeting

Owner/Applicant: **Sprint**

File Numbers:     **PLN 2000-00497**

Attachment:



**Southwest Elevation**

**Northwest Elevation**

**San Mateo County Board of Supervisors' Meeting**

Owner/Applicant:    **Sprint**

File Numbers:    **PLN 2000-00497**

Attachment: _____

AR 0165



LARGE TREE PLANTING — N.T.S. — 1

TRENCHES — N.T.S. — 3

LEGEND — N.T.S. — 2

EMITTERS — N.T.S. — 4

**San Mateo County Board of Supervisors' Meeting**

Owner/Applicant: **Sprint**

File Numbers: **PLN 2000-00497**

Attachment:

AR 0166



AR 0167

## COUNTY OF SAN MATEO
## PLANNING AND BUILDING DEPARTMENT

**DATE**: May 23, 2007

**TO:**       Planning Commission

**FROM:**   Planning Staff

**SUBJECT:**   <u>SUPPLEMENTAL STAFF REPORT</u>:  Consideration of findings for denial for a Use Permit renewal, pursuant to Section 6500 of the County Zoning Regulations, for a cellular communications facility situated in the rear yard of the residential property located at 1175 Palomar Drive in the unincorporated Palomar Park area of San Mateo County.  (Appeal from decision of the Zoning Hearing Officer to approve this renewal.)

          County File Number:  PLN 2000-00497 (Sprint/Nextel)

## BACKGROUND

This item was originally discussed by the Planning Commission on May 9, 2007.  At that time, the Commission indicated that it wished to deny this project.  The item was continued to this date for staff to prepare findings for denial.  Staff has prepared the findings and supporting evidence, which is discussed below.

## DISCUSSION

<u>Issues of Denial</u>

The Planning Commission determined that it could not make the required findings to support renewal of a use permit.  The required findings are that the establishment, maintenance and/or conducting of the use will not, under the circumstances of the particular case, result in a significant impact or be detrimental to the public welfare or injurious to property or improvements in the neighborhood.  Specifically, the Planning Commission identified two issues in their decision to deny this application.  These were:  (1) failure to comply with conditions of approval, and (2) failure to show that alternative sites (for this cellular facility) could not achieve the same results.  These issues are discussed in detail below.

a.   <u>Failure to Comply with Conditions of Approval</u>

      **Find that the applicant, Sprint Spectrum L.P., has failed to comply in a timely manner with conditions of approval established in 2000.  Specifically, the applicant failed to install required landscaping and relocation of a misplaced pole prior to**

*used to make sure the 2 letters recieved on May 9 are included*

**AR 0168**

expiration of the original use permit. The applicant also failed to submit a request for permit renewal prior to the expiration date of the original permit. The presence of this violation of the prior permit is grounds for the denial of an application for development under County Zoning Regulations Section 6105.3.

The applicant was required to install landscaping to screen the equipment cabinet area; however, this landscaping was not installed until December 2006, and only after the ZHO continued the renewal until such time as the landscaping had been installed. The pole in question was incorrectly placed on an adjoining property in 2000. The applicant was informed by the Building Inspection Section that the pole was not in compliance with the approved building plans and that no final sign off on the building permit could be issued until the pole was moved to its approved location. The pole was moved on or about May 9, 2007. This permit was initially granted with a 5-year term (November 2, 2005 expiration date). The deadline to submit an application for renewal was May 2, 2005. The applicant did not submit a request for renewal until February 23, 2006; four months after the initial permit had expired. Together, these three items illustrate a pattern of non-compliance by the applicant and constitutes grounds for denial of a development application under Zoning Regulations Section 6105.3.

b.   Failure to Show that Alternative Sites Were Examined

Find that the applicant, Sprint Spectrum L.P., failed to show that alternative sites ~~in the project vicinity~~ could not achieve the same results as this site in question.

The applicant did not provide evidence that alternative sites in the project vicinity were considered, even if more than one site would be required to achieve the same level of coverage. Without this analysis, there is insufficient evidence to support the claim that this cellular facility, at this location, is necessary.

## ATTACHMENTS

A.   Recommended Findings for Denial
B.   May 9, 2007 Staff Report

*a combination of sites*

MJS:fc – MJSR0553_WFU.DOC

*because inadequate evidence was submitted to support the conclusion that the ag cell site was necessary for the public health*

- 2 -

**AR 0169**

Attachment A

County of San Mateo
Planning and Building Department

## RECOMMENDED FINDINGS OF DENIAL

Permit or Project File Number:  PLN 2000-00497                    Hearing Date:  May 23, 2007

Prepared By:  Michael Schaller, Senior Planner              For Adoption By:  Planning Commission

## RECOMMENDED FINDINGS OF DENIAL

1.    Find that the applicant, Sprint Spectrum L.P., has failed to comply in a timely manner with conditions of approval established in 2000.  Specifically, the applicant failed to install required landscaping and relocation of a misplaced pole prior to expiration of the original use permit.  The applicant also failed to submit a request for permit renewal prior to the expiration date of the original permit.

2.    Find that the applicant, Sprint Spectrum L.P., failed to show that alternative sites in the project vicinity could not achieve the same results as this site in question.

MJS:fc – MJSR0553_WFU.DOC

- 3 -

**AR 0170**

# COUNTY OF SAN MATEO
# PLANNING AND BUILDING DEPARTMENT

**DATE:** May 9, 2007

**TO:**       Planning Commission

**FROM:**     Planning Staff

**SUBJECT:**  Consideration of a Use Permit renewal, pursuant to Section 6500 of the County
Zoning Regulations, to allow the continued operation of a cellular communica-
tions facility consisting of two 13-foot tall monopoles and one equipment
enclosure measuring 18 feet by 15 feet located in the rear yard of the residential
property located at 1175 Palomar Drive in the unincorporated Palomar Park area
of San Mateo County. (Appeal from decision of the Zoning Hearing Officer to
approve this renewal.)

County File Number: PLN 2000-00497 (Sprint/Nextel)

## PROPOSAL

The applicant (Sprint Spectrum L.P.) is proposing to renew the use permit for an existing
wireless communications facility in the rear yard of an existing single-family home at 1175
Palomar Drive. The system consists of two monopoles and one equipment cabinet enclosure.
The cellular antennas are attached to the 13-foot tall monopoles located on the southeast and
northwest sides of the parcel. The equipment cabinet is located in the rear portion of the yard,
adjacent to an existing T-Mobile cellular facility. The total area of the cabinet enclosure is
270 sq. ft., and is surrounded by a 6-foot high metal fence with green plastic slats.

## RECOMMENDATION

That the Planning Commission deny the appeal and uphold the decision of the Zoning Hearing
Officer, County File Number PLN 2000-00497, by making the required findings and subject to
the Conditions of Approval listed in Attachment A.

## BACKGROUND

Report Prepared By: Michael Schaller, Senior Planner, Telephone 650/363-1849

Appellant: Palomar Property Owners (Richard Landi, President)

Applicant: Sprint Spectrum L.P.

Owner:  Curtis Brooks

Location:  1175 Palomar Drive, Palomar Park

APN:  051-416-040

Parcel Size:  22,858 sq. ft.

Existing Zoning:  R-1/S-101 (Single-Family Residential/20,000 sq. ft. min. parcel size)

General Plan Designation:  Low Density Residential (0.3 – 2.3 dwelling units per net acre)

Existing Land Use:  Single Family Home and Other Wireless Communications Facilities

Flood Zone:  Zone C (Area of Minimal Flooding); Community Panel No. 060311-0250B, Effective Date:  July 5, 1984

Environmental Evaluation:  Exempt from environmental review, pursuant to the California Environmental Quality Act (CEQA), Section 15301, Class 1, relating to the continued operations of an existing utility

Setting:  The project site is located on the west side of the street and is accessible from Palomar Drive.  The site is improved with a 1-story, single-family home and an existing T-Mobile cellular facility.  The surrounding uses are single-family homes.  The site is visible from Edgewood Road at Crestview, but the antennae and equipment compounds are painted to blend with the existing vegetation and are masked by both existing Monterey Pine and similar trees located behind the existing facilities.

Chronology:

| Date | | Action |
|------|---|--------|
| November 17, 2000 | - | Use Permit for Sprint cell site approved. |
| December 7, 2006 | - | First Zoning Hearing Officer (ZHO) public hearing to consider renewal of Sprint cell site Use Permit.  Item continued to January 18, 2007. |
| January 18, 2007 | - | ZHO approves renewal of Sprint Use Permit. |
| February 1, 2007 | - | Appeal filed. |
| May 9, 2007 | - | Planning Commission public hearing. |

005

**AR 0172**

## DISCUSSION

### A.  BACKGROUND

The project parcel is 22,858 sq. ft. in size and contains a 2,330 sq. ft. house.  The rear portion of the parcel is heavily forested, with additional trees recently planted to comply with previous conditions of approval.  The first cell facility (Pac Bell, now Cingular) on this parcel was approved on May 15, 1997.  This original permit was renewed by the ZHO at a public hearing on October 29, 2002.  The Sprint facility was initially approved on November 17, 2000.  Currently, there are two additional permit applications before the ZHO to construct two more cell facilities on this parcel.  Metro PCS has proposed a facility comprised of three antennas centered at 13 feet above ground level on two poles, and associated equipment cabinets.  The proposed location of the Metro PCS equipment cabinets is immediately to the east (closer to the house) of the Sprint equipment area.  Verizon has also proposed a facility comprised of three antennas on three poles with associated equipment cabinets.  Two poles would be 17 feet in height while the third pole would be 25 feet in height.  The proposed location of the Verizon equipment cabinets is immediately south of the Sprint equipment area.

### B.  KEY ISSUES OF THE APPEAL

Below in **bold** is a list of relevant appeal issues as presented by the appellant.  The submitted appeal is also attached to the staff report as Attachment B.  Each relevant issue is followed by staff's response.

1.  **We are not convinced that the findings of the Zoning Hearing Officer established the legality of the original cellular facility upon which all of the subsequent operating permits were based as "existing facilities."  The earliest reference to the existing facility is in the November 2, 2000 hearing which states that on May 22, 1997 Use permit approved by the Zoning Hearing Officer for the "existing Pacific Bell Cellular facility."  How did the Pacific Bell Cellular facility get there?  If the Hearing Officer cannot produce any evidence of an original permit or zoning approval, the existing antenna installation at 1175 Palomar Drive constitutes an illegal zoning nonconformity.**

    Staff's Response:  On May 15, 1997, the ZHO conditionally approved USE 97-0005 (applicant: Pac Bell) to construct a cellular facility on the project site.  This Use Permit was then renewed in 2002 at a public hearing.  The reference number for this Use Permit is now PLN 2001-00801.  The project file is available for public review.  A building permit for this cellular facility was issued on June 20, 1997 and was finaled on July 15, 1997.  The Pac Bell facility is legal.

2.  **The subject request should be for a "Use Permit" instead of "Renewal" as the present system is operating without a valid Use Permit.  On November 2, 2000, a Use Permit was issued for a 5-year period expiring on November 2, 2005.  The Use Permit contained the additional stipulation that "The applicant shall file for**

**AR 0173**            006

a renewal of this permit six months prior to the expiration date with the County Planning and Building Department if continuation of this use is desired." The renewal application was submitted on February 23, 2006, almost ten months beyond the specified time for renewal and four months after the expiration of the Use Permit. The application for renewal is invalid.

Staff's Response: While the above is true, all Use Permits are typically allowed to continue to operate unless the County proceeds through a legally noticed revocation process. The rationale supporting this policy is to avoid claims of violating the potential vested rights of the permit holder.

3. Site conditions as required by the Use Permit issued in year 2000 have never been met. One of the two antennae poles is located approximately 4 feet from the approved plan location, violating setback requirements as well as the approved plan and is physically located on a neighbor's property.

Staff's Response: It is true that the pole in question does not conform to the originally approved plans. The applicant has requested to relocate the pole in conformance with the original building permit (BLD 2000-01628) that is still open and this request has been approved by the Community Development Director. The applicant has agreed to remove the facility altogether if the use permit is not renewed.

4. The landscape plan approved as part of the cell sites building permit on May 14, 2004 was never implemented during the time period of the Use Permit.

Staff's Response: It is true that the above-referenced landscaping was not installed and completed prior to the December 7, 2006 ZHO hearing. At that hearing, the ZHO continued deliberations on the permit renewal until the applicant had installed the required landscaping. This was accomplished during the week of December 23, 2006.

5. Regardless of the actual level of the Radio Frequency emissions and the assurance of the operators of such systems that there is no problem, the neighbors in the area and general public are concerned about the effect on them and their children and if at all possible remove themselves from the area. Property values do decline and people are inconvenienced.

Staff's Response: The project complies with standards established under Federal law and the County is preempted from applying different standards and criteria. Additionally, recent case law has established that claims related to a decline in property value must be supported by qualified experts.

6. Property values also decline due to the presence of antennas and enclosures in their neighborhoods as evidenced by the requirements for special landscaping, shapes and colors to prevent the neighbors and general public from seeing the equipment. It was reported by staff that no comments concerning this site were

AR 0174          007

received from the public during the Use Permit period but as noted earlier the requirement for landscaping was imposed in 2004 in response to public protest.

Staff's Response: The Planning Department typically requires the planting of landscaping and the use of colors compatible with the surrounding landscape for all types of permits, including single-family houses and accessory structures. The fact that the building permit approval included landscaping requirements around the equipment structure does not mean the visual impacts were unusually significant.

7.   Related to this site, two contiguous landowners have both presented evidence of property sales that were not consummated due to prospective 'uyers' concerns about the wireless facilities. This is evidence of direct injury to property owners, but this evidence has so far been completely ignored in the staff reports and the proposed findings.

Staff's Response: At the December 7, 2006 ZHO hearing, Lloyd and Sally Einspahr (1165 Palomar Drive) submitted comments on two associated projects on that meeting's agenda in which they state that they lost the sale of their home in June, 2005 because of concerns regarding low-level radio frequency radiation from the cell site. No evidence was submitted substantiating that statement. Federal law and case decisions have provided that claims related to market value must be supported by qualified expert evidence. Regarding the other claim, Alicia Torre of 1354 Pebble Drive (adjacent parcel to the north) submitted written comments at the January 18, 2007 hearing. In her comments, Ms. Torre states that "(her) realtor informed her that the previous owners lost a sale to a couple who rescinded their written off because of their concerns about the cellular installations." Again, no actual data has been submitted to substantiate this claim. Staff reviewed the Assessor's database for Ms. Torre's property and it should be noted that 1354 Pebble Drive has been sold twice since the approval of the first cell facility, and each time, the sale price has increased.

8.   No evidence has been presented proving that this particular site is necessary for the public health, safety, convenience or welfare of the public. The staff report only asserts that it would result in an "enhanced network" which is a "benefit." This site is not unique in its ability to provide the desired wireless service to this area. Sites are available that are not within the area zoned R-1/S-101/DR and it is not evident that the applicant has been required to carry out this investigation. Residential areas should not be violated in order to provide enhanced operation to commercial entities.

Staff's Response: This facility provides coverage in Sprint's cellular network. The information presented by the applicant indicates that without this particular site, Sprint's network has a significant hole in this area, which is due to the surrounding topography. There was discussion of this issue at the ZHO hearings.

In order for cellular technology to work properly, cell sites need to be in the direct line of sight of each other. Attempting to place this facility in nearby open space areas

AR 0175      008

such as Edgewood County Park or Pulgas Ridge Open Space Preserve could require extensive grading and vegetation removal, and may not work anyway if the antennas cannot communicate directly with each other.

In the case of an area wide catastrophic event, such as a major earthquake or wildland fire, the public's ability to have mobile communications, regardless of their location, is of paramount importance.

9. **In support, the General Plan although it does not speak specifically about cellular facilities, it does state that the urban area design concept should "ensure that new development in urban areas is designed and constructed to contribute to the orderly and harmonious development of the locality" (4.35b); that land use designations should be distributed "in order to achieve orderly, understandable, coherent, and workable land use patterns" (7.7); and that land use compatibility should "protect and enhance the character of existing single-family areas" and "protect existing single-family areas from adjacent incompatible land use designations which would degrade the environmental quality and economic stability of the area" (8.14). These facilities under consideration, are money-making ventures for the property owners who earn annual fees for allowing this use of their property, unlike electrical, telephone and gas lines.**

Staff's Response: Regarding the first policy cited (4.35b), the applicant has been required to install and maintain landscaping to screen the facility. The antennas and poles must be painted so that they blend in with the landscaping. The equipment cabinets must be enclosed within a fenced area to screen them from view. All of these measures have been required to ensure that the facility will not be disruptive. Concerning the second policy (7.7), no evidence has been presented that the facility is inhibiting the use of this or neighboring parcels of land for their primary designation, which is residential. Regarding the final policy cited (8.14), staff is not aware of any factual evidence that has been presented indicating how this facility has degraded the environment (no evidence of air or noise pollution, destruction of sensitive habitat, etc.) and staff has no evidence to support the suggestion that property values have been negatively impacted or that the economic stability of the area would be jeopardized.

10. **Does the Building Site Coverage Area Ratio adhere to the requirements in Section 6300.10.50?**

Staff's Response: Yes, the S-101 zoning district allows a maximum lot coverage of 25%. For the subject parcel, this translates into a maximum lot coverage of 5,714 sq. ft. The existing house, plus the two existing cell sites have a combined lot coverage of 2,355 sq. ft.

11. **Does the Building Floor Area adhere to the requirements of Section 6300.10.60?**

-6-

Staff's Response: Yes, the S-101 zoning district allows a maximum floor area of 6,457 sq. ft. for a parcel of this size. The existing house, plus the two existing cell sites have a combined floor area of 2,355 sq. ft.

12. **There are indications that there are building permit violations on the property. Section 6105.1 stipulates that no permit may be issued for any property that has existing building or zoning violations. As such, the permits must be withheld.**

Staff's Response: As discussed above under Comment No. 3, there is an open building permit for this facility. One of the poles in question was incorrectly placed on an adjacent parcel. The applicant has requested permission to move this pole back to the approved location on Mr. Brooks' property and the Planning Department has granted this request. Once the pole is relocated, the project will again be in compliance with the conditions of approval.

13. **There can be found no evidence that this facility was reviewed by the Design Review Committee, which is required prior to issuing a building permit.**

Staff's Response: Cellular facilities have historically not been reviewed by the Design Review Committee, which focuses on residential and some commercial development in specified areas. The design standards for Palomar Park contained in the zoning regulations do not necessarily pertain to this type of structure as they focus on standards, such as building façades and roof treatments. The Zoning Hearing Officer is charged with reviewing all aspects of a project, including its compliance with the visual resource policies of the General Plan and, where applicable, the design review standards contained within the Zoning Regulations. In approving this project, the Zoning Hearing Officer found that the project complies with all aspects of the General Plan and the Zoning Regulations.

C. COMPLIANCE WITH CONDITIONS OF THE LAST APPROVAL

The conditions from the approval of the use permit in 2000 are assessed below with regard to compliance, and whether the conditions should either be retained or revised. Staff recommends that some conditions, as indicated, be removed in instances where the condition: (1) has been complied with, and/or (2) is no longer deemed feasible or necessary.

Planning Department

1. This approval applies only to the proposal as described in this report and plans and documents submitted to the Planning Department on July 14, 2000. Minor adjustments to the project in the course of applying for building permits may be approved by the Community Development Director if they are consistent with the intent of and in substantial conformance with this approval.

*Compliance with Condition?* No. One of the two antennae poles was initially constructed approximately 4 feet from the approved location and was outside the

AR 0177

010

property line. However, on April 12, 2007, the Planning Department approved a revision to the applicant's still open building permit to move the pole in question to its approved location. In addition, at the time of the December 7, 2006 ZHO hearing, the applicant had not implemented the landscape plan approved as part of this cell site's building permit on May 14, 2004 (Attachment E). The ZHO continued this item subject to installation of the landscaping, which was completed by the applicant during the week of December 25, 2006.

*Recommend to Retain Condition?* Yes.

2.   The applicant shall obtain a building permit and develop in accordance with the approved plans.

*Compliance with Condition?* No. A building permit was issued and, as of the writing of this staff report, has not been finalized for the cell facility.

*Recommend to Retain Condition?* Yes, but modified as follows: The applicant shall complete all aspects of the building permit within 4 months of Use Permit Renewal.

3.   This Use Permit shall be valid for a 5-year period and shall expire on November 2, 2005. The applicant shall file for a renewal of this permit six months prior to the expiration with the County Planning and Building Department, if continuation of this use is desired.

*Compliance with Condition?* No. The renewal application was only submitted on February 23, 2006, after a third and final renewal notice was sent extending the deadline to February 27, 2006.

*Recommend to Retain Condition?* Yes, but modified to:

This Use Permit shall be valid for a 10-year period and shall expire on May 9, 2017. The applicant shall file for a renewal of this permit six months prior to the expiration with the County Planning and Building Department, if continuation of this use is desired. Any modifications to this facility will require a use permit amendment. If an amendment is requested, the applicant shall submit the necessary documents and fees for consideration at a public hearing.

State legislation recently signed into law by the Governor has now extended the life span of all Use Permits for cellular facilities to 10 years. This condition has been modified to reflect that change in State law.

4.   The monopoles, antennas, and fencing shall be painted the same "enviro-green" color as the existing Pacific Bell equipment cabinet. A color sample shall be submitted to the Planning Counter prior to building permit issuance. The applicant shall include file/case number with all color samples. Color verification by a building inspector

AR 0178      011

shall occur in the field after the applicant has painted the equipment an approved color, but before the applicant schedules a final inspection.

*Compliance with Condition?*  Yes.  The monopoles are the same color as the existing T-Mobile (previously Pacific Bell) enclosure but both seem to have faded.

*Recommend to Retain Condition?*  Yes, but modified to: The monopoles and antennas shall be repainted in the originally approved and painted color, "enviro-green." Metal fencing with green plastic slats shall be maintained in good condition. Any proposed change to the color shall be reviewed and approved by the Planning Department prior to painting. Any new color proposed shall blend with the character of the site and the vegetation in the vicinity.

5.  Construction hours shall be Monday through Friday 7:00 a.m. to 6:00 p.m., Saturday 9:00 a.m. to 5:00 p.m., and no construction will be allowed on Sundays or national holidays.

   *Compliance with Condition?*  Yes.

   *Recommend to Retain Condition?*  Yes.  The building permit is still in an "issued" status and has not been finaled.

6.  Noise levels produced by the proposed construction activity shall not exceed 80 dBA level at any one moment.

   *Compliance with Condition?*  Yes.

   *Recommend to Retain Condition?*  Yes.  The building permit is still in an "issued" status and has not been finaled.

7.  The installation shall be removed in its entirety at that time when this technology becomes obsolete or this facility is no longer needed.

   *Compliance with Condition?*  Yes.  The installation has not been removed since technology is not yet obsolete and the facility is still needed.

   *Recommend to Retain Condition?*  Yes.

8.  The applicant shall submit an erosion control plan which implements best management practices to prevent erosion and sedimentation during the entire construction process prior to building permit issuance. The plan shall include, but is not limited to (1) installation of silt blankets and fiber rolls below all areas of earth clearing, (2) covering of surcharges for protection from rain and wind erosion, and (3) replanting all disturbed areas immediately upon completion of construction with indigenous vegetation.

012

**AR 0179**

*Compliance with Condition?* Yes. This was confirmed as having been met when the initial building permit for the facility was issued.

*Recommend to Retain Condition?* Yes. The building permit is still in an "issued" status and has not been finaled.

9. During project construction, the applicant shall, pursuant to Section 5022 of the San Mateo County Ordinance Code, minimize the transport and discharge of stormwater runoff from the construction site into storm drain systems and water bodies by:

   a. Disposing of removed soil in a County approved landfill, or by spreading the soil in the immediate vicinity employing the above erosion control techniques at a depth not to exceed 6 inches in height.

   b. Stabilizing all denuded areas and maintaining erosion control measures continuously between October 15 and April 15.

   c. Removing spoils promptly and avoiding stockpiling of fill materials, when rain is forecast. If rain threatens, stockpiled soils and other materials shall be covered with a tarp or other waterproof material.

   d. Storing, handling, and disposing of construction materials and wastes so as to avoid their entry to the storm drain system or water body.

   e. Avoid cleaning, fueling or maintaining vehicles on-site, except in an area designated to contain and treat runoff.

   f. The applicant shall revegetate construction areas with native plant materials (trees, shrubs, and/or ground cover), which are compatible with the surrounding vegetation and are suitable to the climate, soil, and ecological characteristics of the area.

   *Compliance with Condition?* Yes. This was confirmed as having been met when the initial building permit was issued.

   *Recommend to Retain Condition?* Yes. The building permit is still in an "issued" status and has not been finaled.

## California Department of Forestry

10. Maintain around and adjacent to such buildings or structures a fuel-break/fire break made by removing and cleaning away flammable vegetation for a minimum distance of 30 feet. Remove that dead or dying portion of any tree which extends over the any structure.

AR 0180    013

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* Yes.

11. All buildings and structures must have an address posted in such a location and in such a manner that it can be easily seen while traveling in both directions on the main road day or night. Numerals shall be contrasting in color to their background and shall be no less than 4 inches in height, and have a minimum stroke of ¾ inch.

   *Compliance with Condition?* Yes.

   *Recommend to Retain Condition?* Yes.

12. All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent. Plans and calculations must be submitted to the San Mateo County Building Inspection Section for review and approval by the County Fire Department.

   *Compliance with Condition?* Yes.

   *Recommend to Retain Condition?* Yes, but modified to:

   All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent which shall be maintained for the duration of the use permit.

13. Access must be provided from the street to the access gate at the proposed site. The access must be provided in such a manner that emergency crews can get emergency medical equipment and fire fighting equipment to the scene.

   *Compliance with Condition?* Yes. This condition was met at the time of initial building permit for the facility and was confirmed by a site visit on September 22, 2006.

   *Recommend to Retain Condition?* Yes.

14. The proposed wood fencing is not desirable in this area because of the fire hazard. A metal fence with slats would be more desirable solution to protect the facility.

   *Compliance with Condition?* Yes. This was confirmed as having been met when the initial building permit for the facility and was confirmed by a site visit on September 22, 2006.

   *Recommend to Retain Condition?* Yes, But Modified: The metal fence with slats shall be maintained to protect this facility.

**AR 0181**

014

15. A Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

*Compliance with Condition?* Yes. No entry gate prevents entrance to the property. The site is open and accessible at all times.

*Recommend to Retain Condition?* Yes, but modify to:

The project site shall remain accessible at all times. If an entry gate is installed then a Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

16. A final inspection will be required before the site can be put into use. All Project conditions which result in the issuance of a building permit will be required to be completed at that time.

*Compliance with Condition?* Yes. County Fire has finaled its responsibility for the building permit on June 21, 2001.

*Recommend to Retain Condition?* No.

17. A more in-depth plan review will be conducted at the time a building permit is applied for. This has been a preliminary review and additional conditions may be placed on the project at the building permit application stage.

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* No.

D. CONFORMANCE WITH USE PERMIT FINDINGS

In order to continue the operation of this facility, the following use permit findings are necessary:

1. **Find that the establishment, maintenance and/or conducting of the use will not, under the circumstances of the particular case, be detrimental to the public welfare or injurious to property or improvements in said neighborhood.**

The impacts from the continued operation of this facility, subject to the recommended conditions of approval, will be minimal. County staff has received no complaints regarding interference with household appliances or communications equipment resulting from the antennas.

015

**AR 0182**

Because the facility is unmanned and only requires periodic service visits, continued operation of the facility should not generate additional traffic, noise, or intensity of use of the property.

2. **Find that the use is necessary for the public health, safety, convenience, or welfare.**

The use is for telecommunication services. The FCC has established the desirability and need for wireless communications facilities to enable communication between mobile units and the existing wire-dependent telephone system. This facility contributes to an enhanced wireless network for increased clarity, range, and system capacity, and therefore is a benefit to both public and private users. The wireless network is considered necessary for public health, safety, convenience, and welfare, particularly in the case of a large scale natural disaster, such as an earthquake or wildland fire. No adverse effects to public health and safety would result from the continued operation of this facility.

E. ENVIRONMENTAL REVIEW

The proposed renewal is categorically exempt from the California Environmental Quality Act (CEQA) under Section 15301 (Class 1): "Operation or permitting of existing private structures, involving no expansion of use beyond that existing at the time of the lead agency's determination."

F. REVIEWING AGENCIES

County Department of Public Works
County Building Inspection Section
County Fire Marshal

**ATTACHMENTS**

A. Recommended Findings and Conditions of Approval
B. Appellant's letter of appeal
C. Location Map
D. Site Plan
E. December 7, 2006 Staff Report
F. January 18, 2007 Supplemental Staff Report

MJS:kcd - MJSR0462_WKU.DOC

016

AR 0183

Attachment A

County of San Mateo
Planning and Building Department

## RECOMMENDED FINDINGS AND CONDITIONS OF APPROVAL

Permit or Project File Number:  PLN 2000-00497                Hearing Date:  May 9, 2007

Prepared By:  Michael J. Schaller, Project Planner        For Adoption By:  Planning Commission

## RECOMMENDED FINDINGS

For the Environmental Review, Find:

1.  That this project is exempt from environmental review pursuant to the California Environmental Quality Act (CEQA), Section 15301, Class 1, relating to operation or permitting of existing private structures or facilities involving no expansion of use.

For the Use Permit, Find:

2.  That the establishment, maintenance, and conducting of the proposed use will not, under the circumstances of the particular case, result in a significant adverse impact, or be detrimental to the public welfare or injurious to property or improvements in said neighborhood.  The impacts from the continued operation of this facility, subject to the recommended conditions of approval, will be minimal.  County staff has received no complaints regarding interference with household appliances or communications equipment resulting from the antennas.  Because the facility is unmanned and only requires periodic service visits, continued operation of the facility should not generate additional traffic, noise, or intensity of use of the property.

3.  That the approval of this cellular telecommunications addition is necessary for the public health, safety, convenience or welfare.  The use is for telecommunication services.  The FCC has established the desirability and need for wireless communications facilities to enable communication between mobile units and the existing wire-dependent telephone system.  This facility contributes to an enhanced wireless network for increased clarity, range, and system capacity, and therefore is a benefit to both public and private users.  The wireless network is considered necessary for public health, safety, convenience, and welfare, particularly in the case of a large-scale natural disaster, such as an earthquake or wildland fire.  No adverse effects to public health and safety will result from the continued operation of this facility.

AR 0184          017

## RECOMMENDED CONDITIONS OF APPROVAL

Planning Department

1.  This approval applies only to the proposal as described in this report and plans and documents submitted to the Planning Department on July 14, 2000. Minor adjustments to the project in the course of applying for building permits may be approved by the Community Development Director if they are consistent with the intent of and in substantial conformance with this approval.

2.  The applicant shall complete all aspects of the building permit within 4 months of Use Permit Renewal.

3.  This Use Permit shall be valid for a 10-year period and shall expire on May 9, 2017. The applicant shall file for a renewal of this permit six months prior to the expiration with the County Planning and Building Department, if continuation of this use is desired. Any modifications to this facility will require a use permit amendment. If an amendment is requested, the applicant shall submit the necessary documents and fees for consideration at a public hearing.

4.  The monopoles and antennas shall be repainted in the originally approved and painted color, "enviro-green." Metal fencing with green plastic slats shall be maintained in good condition. Any proposed change to the color shall be reviewed and approved by the Planning Department prior to painting. Any new color proposed shall blend with the character of the site and the vegetation in the vicinity.

5.  Construction hours shall be Monday through Friday 7:00 a.m. to 6:00 p.m., Saturday 9:00 a.m. to 5:00 p.m., and no construction will be allowed on Sundays or national holidays.

6.  Noise levels produced by the proposed construction activity shall not exceed 80 dBA level at any one moment.

7.  The installation shall be removed in its entirety at that time when this technology becomes obsolete or this facility is no longer needed.

8.  The applicant shall submit an erosion control plan which implements best management practices to prevent erosion and sedimentation during the entire construction process prior to building permit issuance. The plan shall include, but is not limited to (1) installation of silt blankets and fiber rolls below all areas of earth clearing, (2) covering of surcharges for protection from rain and wind erosion, and (3) replanting all disturbed areas immediately upon completion of construction with indigenous vegetation.

9.  During project construction, the applicant shall, pursuant to Section 5022 of the San Mateo County Ordinance Code, minimize the transport and discharge of stormwater runoff from the construction site into storm drain systems and water bodies by:

AR 0185

018

a. Disposing of removed soil in a County approved landfill, or by spreading the soil in the immediate vicinity employing the above erosion control techniques at a depth not to exceed 6 inches in height.

b. Stabilizing all denuded areas and maintaining erosion control measures continuously between October 15 and April 15.

c. Removing spoils promptly and avoiding stockpiling of fill materials, when rain is forecast. If rain threatens, stockpiled soils and other materials shall be covered with a tarp or other waterproof material.

d. Storing, handling, and disposing of construction materials and wastes so as to avoid their entry to the storm drain system or water body.

e. Avoid cleaning, fueling or maintaining vehicles on-site, except in an area designated to contain and treat runoff.

f. The applicant shall revegetate construction areas with native plant materials (trees, shrubs, and/or ground cover), which are compatible with the surrounding vegetation and are suitable to the climate, soil, and ecological characteristics of the area.

<u>California Department of Forestry</u>

10. Maintain, around and adjacent to, such buildings or structures, a fuel-break/fire break made by removing and clearing away flammable vegetation for a minimum distance of 30 feet. Remove that dead or dying portion of any tree which extends over any structure.

11. All buildings and structures must have an address posted in such a location and in such a manner that it can be easily seen while traveling in both directions on the main road day or night. Numerals shall be contrasting in color to their background and shall be no less than 4 inches in height, and have a minimum stroke of ¾ inch.

12. All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent which shall be maintained for the duration of the use permit.

13. Access must be provided from the street to the access gate at the proposed site. The access must be provided in such a manner that emergency crews can get emergency medical equipment and fire fighting equipment to the scene.

14. The existing metal fence with slats shall be maintained to protect the facility.

15. The project site shall remain accessible at all times. If an entry gate is installed then a Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

MJS:kcd - MJSR0462_WKU.DOC

AR 0186

019

# COUNTY OF SAN MATEO
## PLANNING AND BUILDING DEPARTMENT

**DATE:** May 9, 2007

**TO:**        Planning Commission

**FROM:**      Planning Staff

**SUBJECT:**   EXECUTIVE SUMMARY: Consideration of a Use Permit renewal to allow the continued operation of a cellular communications facility consisting of two 13-foot-tall monopoles and one equipment enclosure measuring 18 feet by 15 feet located in the rear yard of the residential property located at 1175 Palomar Drive in the unincorporated Palomar Park area of San Mateo County. (Appeal from decision of the Zoning Hearing Officer to approve this renewal.)

## PROPOSAL

The applicant (Sprint Spectrum L.P.) is proposing to renew their use permit for an existing wireless communications facility in the rear yard of an existing single-family home at 1175 Palomar Drive. The system consists of two monopoles and one equipment cabinet enclosure. The cellular antennas are attached to the 13-foot-tall monopoles located on the southeast and northwest sides of the parcel. The equipment cabinet is located in the rear portion of the yard, adjacent to an existing T-Mobile cellular facility. The total area of the cabinet enclosure is 270 sq. ft., and is surrounded by a 6-foot high metal fence with green plastic slats.

## RECOMMENDATION

That the Planning Commission deny the appeal and uphold the decision of the Zoning Hearing Officer, County File Number PLN 2000-00497, by making the required findings and subject to the Conditions of Approval.

## SUMMARY

This Use Permit was initially approved by the Zoning Hearing Officer (ZHO) on November 17, 2000. It was the second cellular facility to be approved on this parcel. No appeals were filed at that time. The renewal of this Use Permit was first heard by the ZHO on December 7, 2006. After considerable public testimony and discussion, the ZHO continued the item so that the applicant could install the required landscaping and for staff to investigate the following items:

1.   *Verify the installation of the approved landscaping plan that was previously required.*

2.   *Revise the recommended conditions so that they stand alone and are not tied to or dependent upon any other proposal for this site.*

3.  *Reevaluate the visual impact and other neighborhood compatibility issues relevant to the existing operation and recommend any new or revised conditions as necessary.*

4.  *Identify the appropriate zoning setback requirement for the antenna pole to be relocated.*

5.  *Provide original approval letter and original staff report from the initial (2000) use permit approval.*

For the January 18, 2007 hearing, staff responded to the above items. Based upon the additional evidence, the ZHO approved the renewal of this Use Permit.

Regarding the subsequent appeal, the main issues raised in this appeal are: (1) the permit holder (Sprint PCS) has failed to comply with conditions of approval, including construction of antennas in the wrong location, failure to implement a landscape plan in a timely manner, and failure to submit renewal fees and applications by the stipulated deadline; (2) perceived impacts to property values due to RF radiation; and (3) incompatibility of use with residential land use designation.

In response to these issues, staff has verified that the landscape plan was implemented prior to the ZHO's decision to renew the permit, staff has approved a revision to this project's open building permit which moves the antenna in question to its correct location, and renewal fees and applications were submitted. Regarding perceived impacts to property values, the cellular facility complies with standards established under Federal law and the County is preempted from applying different standards and criteria. Federal law and case decisions have established that claims related to market value must be supported by qualified expert evidence. Regarding the claim of incompatible use, there are many cellular facilities located within residential areas of County. Staff has found no evidence that this facility is inhibiting the use of this or neighboring parcels of land for residential use. No factual evidence has been presented that this facility has degraded the environment and staff has no evidence to support the suggestion that property values have been negatively impacted or that the economic stability of the area has been jeopardized.

MJS:kcd - MJSR0461_WKU.DOC

# PALOMAR PROPERTY OWNERS

419 Palomar Drive
Palomar Park, CA 94062

January 31, 2007

Planning Commission
County of San Mateo
455 County Center
Redwood City, CA 94063

Subject:       Appeal of Use Permit Renewal
PLN 2000-00497
1175 Palomar Drive, APN 051-416-040

Honorable Commissioners:

Palomar Property Owners (PPO) wishes to appeal the decision made by the Zoning Hearing Officer in the above referenced hearing.   We request that the decision be reversed and the application for renewal be denied.

1.       We are not convinced that the findings of the Zoning Hearing Officer established the legality of the  original cellular facility upon which all of the subsequent operating permits were based as "existing facilities".  The earliest reference to the existing facility is in the November 2, 2000 hearing which states that on May 22, 1997 Use permit approved by the Zoning Hearing Officer for the "existing Pacific Bell Cellular facility." How did the Pacific Bell Cellular facility get there?  If the Hearing Officer cannot produce any evidence of an original permit or zoning approval, the existing antenna installation at 1175 Palomar Drive constitutes an illegal zoning nonconformity.  The explicit purpose of Zoning Regulation Section 6130 is to phase out these non conformities.

2.       The subject request should be for a "Use Permit" instead of  "Renewal" as the present system is operating without a valid Use Permit.  On November 2, 2000, a Use Permit was issued valid for a five year period expiring on November 2, 2005.  The Use Permit contained the additional stipulation that "The applicant shall file for a renewal of this permit six months prior to the expiration date with the County Planning and

**AR 0189**

022

Building Division if continuation of this use is desired." The renewal application was submitted on February 23, 2006, almost ten months beyond the specified time for renewal and four months after the expiration of the Use Permit. The application for renewal is invalid.

3.    The Use Permit, expiring on November 2, 2005, should not have been finalized or should have been revoked earlier.

    a.  Site conditions as required by the Use Permit issued in year 2000 have never been met.  One of the two antennae poles is located approximately 4 feet from the approved plan location, violating setback requirements as well as the approved plan and is physically located on a neighbors' property.

    b.    The landscape plan approved as part of the cell sites building permit on May 14, 2004 was never implemented during the time period of the Use Permit.

4.    Under the intent of the provisions of Section 6500 (Use Permits) which are being used to govern the installation of wireless communication systems in areas zoned 1/S-101DR, permits must not be issued without due consideration of the existing zoning requirements and the necessity of using this particular site.  Neither of the two findings required for the Use Permit can be made.

    a. The first finding requires "That the establishment, maintenance and/or conducting of the proposed use will not, under the circumstances of the case be detrimental to the public welfare or injurious to property or improvements in said neighborhood."

        1).    Regardless of the actual level of the Radio Frequency emissions and the assurance of the operators of such systems that there is no problem, the neighbors in the area and general public are concerned about the effect on them and their children and if at all possible remove themselves from the area.  Property values do decline and people are inconvenienced.

        2).    Property values also decline due to the presence of antennas and enclosures in their neighborhoods as evidence of the requirements for special landscaping, shapes and colors to prevent the neighbors and general public from seeing the equipment.  It was reported by staff that no comments concerning this site were received from the public during the Use Permit period but as noted earlier the requr9ement for landscaping was imposed in 2004 in response to public protest.

        3).    Related to this site, two contiguous landowners have both

023

**AR 0190**

presented evidence of property sales that were not consummated due to prospective buyers' concerns about the wireless facilities. This is evidence of direct injury to property owners, but this evidence has so far been completely ignored in the staff reports and the proposed findings.

b.    The second finding requires "That the approval of this wireless telecommunications facility is necessary for the public health, safety, convenience, or welfare."

1.    No evidence has been presented proving that this particular site is necessary for the public health, safety, convenience or welfare of the public. The staff report only asserts that it would result in an "enhanced network" which is a "benefit." This site is not unique in its ability to provide the desired wireless service to this area. Sites are available that are not within the area zoned R-1/S-101DR and it is not evident that the applicant has been required to carry out this investigation. Residential areas should not be violated in order to provide enhanced operation to commercial entities.

5.    In support, the General Plan although it does not speak specifically about cellular facilities, it does state that the urban area design concept should "ensure that new development in urban areas is designed and constructed to contribute to the orderly and harmonious development of the locality" (4.35b); that land use designations should be distributed "in order to achieve orderly, understandable, coherent, and workable land use patterns" (7.7); and that land use compatibility should "protect and enhance the character of existing single-family areas" and "protect existing single-family areas from adjacent incompatible land use designations which would degrade the environmental quality and economic stability of the area." (8.14) These facilities under consideration, are moneymaking ventures for the property owners who earn annual fees for allowing this use of their property, unlike electrical, telephone and gas lines.

6.    Additional questions subject to discussion:

a.    Does the Building Site Coverage Area Ratio adhere to the requirements in Section 6300.10.50?

b.    Does the Building Floor Area adhere to the requirements of Section 6300.10.60?

c.    There are indications that there are building permit violations on the property. Section 6105.1 stipulates that no permit may be issued for any property that has existing building or zoning violations. As such, the permits must be withheld.

024

7.    There can be found no evidence that this facility was reviewed by the Design Review Committee which is required prior to issuing a building permit.

8.    Concern also exists that the Use Permit for these facilities in year 2000 was originally permitted relying in part on a misleading document from Palomar Property Owners (PPO). Following questions from the audience at an earlier meeting concerning approval by PPO of the Use Permit in year 2000, the Zoning Hearing Officer stated on the record January 4, 2007, that the County had received a letter which said PPO did not oppose the cellular installation. He also now acknowledged that this letter was signed by the site owner who was, at the time, President of PPO. PPO has diligently searched its records and there is no record of notification to PPO of the planned Use Permits by either the County or the site owner/President nor is there any record of support or opposition being discussed at any board meeting. In searching PPO records, it was also discovered that PPO's mailing address had been diverted to the site owners/Presidents' home thereby preventing any notification from the County reaching any other Board member. The mailing address has been corrected and mail is now being directed to PPO's legal mailing address.

The information provided above clearly demonstrates the absence of sufficient legal grounds for the granting of a Use Permit and/or renewal of the Use Permit. In the absence of the proper foundation for the granting of a Use Permit, it is the recommendation of the Board of Directors of Palomar Property Owners that the application for renewal be denied.

Sincerely,

Richard G. Landi, President

**Board of Directors**
Jeff Garratt  •  Leon Glahn  •  Emile Kishek  •  Richard Landi  •  Carol Mondino
Daniel Petelin  •  Tom Rice  •  Trish Taylor  •  Bernie Wooster-Wong

cc:    Supervisor Richard Gordon
       Supervisor Jerry Hill

025

**AR 0192**