shall occur in the field after the applicant has painted the equipment an approved color, but before the applicant schedules a final inspection.

*Compliance with Condition?* Yes. The monopoles are the same color as the existing T-Mobile (previously Pacific Bell) enclosure but both seem to have faded.

*Recommend to Retain Condition?* Yes, but modified to: The monopoles and antennas shall be repainted in the originally approved and painted color, "enviro-green." Metal fencing with green plastic slats shall be maintained in good condition. Any proposed change to the color shall be reviewed and approved by the Planning Department prior to painting. Any new color proposed shall blend with the character of the site and the vegetation in the vicinity.

5.    Construction hours shall be Monday through Friday 7:00 a.m. to 6:00 p.m., Saturday 9:00 a.m. to 5:00 p.m., and no construction will be allowed on Sundays or national holidays.

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* Yes. The building permit is still in an "issued" status and has not been finaled.

6.    Noise levels produced by the proposed construction activity shall not exceed 80 dBA level at any one moment.

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* Yes. The building permit is still in an "issued" status and has not been finaled.

7.    The installation shall be removed in its entirety at that time when this technology becomes obsolete or this facility is no longer needed.

*Compliance with Condition?* Yes. The installation has not been removed since technology is not yet obsolete and the facility is still needed.

*Recommend to Retain Condition?* Yes.

8.    The applicant shall submit an erosion control plan which implements best management practices to prevent erosion and sedimentation during the entire construction process prior to building permit issuance. The plan shall include, but is not limited to (1) installation of silt blankets and fiber rolls below all areas of earth clearing, (2) covering of surcharges for protection from rain and wind erosion, and (3) replanting all disturbed areas immediately upon completion of construction with indigenous vegetation.

**AR 0441**

*Compliance with Condition?*  Yes.  This was confirmed as having been met when the initial building permit for the facility was issued.

*Recommend to Retain Condition?*  Yes.  The building permit is still in an "issued" status and has not been finaled.

9.    During project construction, the applicant shall, pursuant to Section 5022 of the San Mateo County Ordinance Code, minimize the transport and discharge of stormwater runoff from the construction site into storm drain systems and water bodies by:

a.    Disposing of removed soil in a County approved landfill, or by spreading the soil in the immediate vicinity employing the above erosion control techniques at a depth not to exceed 6 inches in height.

b.    Stabilizing all denuded areas and maintaining erosion control measures continuously between October 15 and April 15.

c.    Removing spoils promptly and avoiding stockpiling of fill materials, when rain is forecast.  If rain threatens, stockpiled soils and other materials shall be covered with a tarp or other waterproof material.

d.    Storing, handling, and disposing of construction materials and wastes so as to avoid their entry to the storm drain system or water body.

e.    Avoid cleaning, fueling or maintaining vehicles on-site, except in an area designated to contain and treat runoff.

f.    The applicant shall revegetate construction areas with native plant materials (trees, shrubs, and/or ground cover), which are compatible with the surrounding vegetation and are suitable to the climate, soil, and ecological characteristics of the area.

*Compliance with Condition?*  Yes.  This was confirmed as having been met when the initial building permit was issued.

*Recommend to Retain Condition?*  Yes.  The building permit is still in an "issued" status and has not been finaled.

California Department of Forestry

10.    Maintain around and adjacent to such buildings or structures a fuel-break/fire break made by removing and cleaning away flammable vegetation for a minimum distance of 30 feet.  Remove that dead or dying portion of any tree which extends over the any structure.

**AR 0442**

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* Yes.

11.   All buildings and structures must have an address posted in such a location and in such a manner that it can be easily seen while traveling in both directions on the main road day or night. Numerals shall be contrasting in color to their background and shall be no less than 4 inches in height, and have a minimum stroke of ¾ inch.

   *Compliance with Condition?* Yes.

   *Recommend to Retain Condition?* Yes.

12.   All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent. Plans and calculations must be submitted to the San Mateo County Building Inspection Section for review and approval by the County Fire Department.

   *Compliance with Condition?* Yes.

   *Recommend to Retain Condition?* Yes, but modified to:

   All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent which shall be maintained for the duration of the use permit.

13.   Access must be provided from the street to the access gate at the proposed site. The access must be provided in such a manner that emergency crews can get emergency medical equipment and fire fighting equipment to the scene.

   *Compliance with Condition?* Yes. This condition was met at the time of initial building permit for the facility and was confirmed by a site visit on September 22, 2006.

   *Recommend to Retain Condition?* Yes.

14.   The proposed wood fencing is not desirable in this area because of the fire hazard. A metal fence with slats would be more desirable solution to protect the facility.

   *Compliance with Condition?* Yes. This was confirmed as having been met when the initial building permit for the facility and was confirmed by a site visit on September 22, 2006.

   *Recommend to Retain Condition?* Yes, But Modified: The metal fence with slats shall be maintained to protect this facility.

**AR 0443**

15. A Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

*Compliance with Condition?* Yes. No entry gate prevents entrance to the property. The site is open and accessible at all times.

*Recommend to Retain Condition?* Yes, but modify to:

The project site shall remain accessible at all times. If an entry gate is installed then a Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

16. A final inspection will be required before the site can be put into use. All Project conditions which result in the issuance of a building permit will be required to be completed at that time.

*Compliance with Condition?* Yes. County Fire has finaled its responsibility for the building permit on June 21, 2001.

*Recommend to Retain Condition?* No.

17. A more in-depth plan review will be conducted at the time a building permit is applied for. This has been a preliminary review and additional conditions may be placed on the project at the building permit application stage.

*Compliance with Condition?* Yes.

*Recommend to Retain Condition?* No.

D.  CONFORMANCE WITH USE PERMIT FINDINGS

In order to continue the operation of this facility, the following use permit findings are necessary:

1. **Find that the establishment, maintenance and/or conducting of the use will not, under the circumstances of the particular case, be detrimental to the public welfare or injurious to property or improvements in said neighborhood.**

The impacts from the continued operation of this facility, subject to the recommended conditions of approval, will be minimal. County staff has received no complaints regarding interference with household appliances or communications equipment resulting from the antennas.

**AR 0444**

Because the facility is unmanned and only requires periodic service visits, continued operation of the facility should not generate additional traffic, noise, or intensity of use of the property.

2. **Find that the use is necessary for the public health, safety, convenience, or welfare.**

The use is for telecommunication services. The FCC has established the desirability and need for wireless communications facilities to enable communication between mobile units and the existing wire-dependent telephone system. This facility contributes to an enhanced wireless network for increased clarity, range, and system capacity, and therefore is a benefit to both public and private users. The wireless network is considered necessary for public health, safety, convenience, and welfare, particularly in the case of a large scale natural disaster, such as an earthquake or wildland fire. No adverse effects to public health and safety would result from the continued operation of this facility.

E.   ENVIRONMENTAL REVIEW

The proposed renewal is categorically exempt from the California Environmental Quality Act (CEQA) under Section 15301 (Class 1): "Operation or permitting of existing private structures, involving no expansion of use beyond that existing at the time of the lead agency's determination."

F.   REVIEWING AGENCIES

County Department of Public Works
County Building Inspection Section
County Fire Marshal

**ATTACHMENTS**

A.   Recommended Findings and Conditions of Approval
B.   Appellant's letter of appeal
C.   Location Map
D.   Site Plan
E.   December 7, 2006 Staff Report
F.   January 18, 2007 Supplemental Staff Report

MJS:kcd - MJSR0462_WKU.DOC

AR 0445

Attachment A

County of San Mateo
Planning and Building Department

## RECOMMENDED FINDINGS AND CONDITIONS OF APPROVAL

Permit or Project File Number:  PLN 2000-00497          Hearing Date:  May 9, 2007

Prepared By:  Michael J. Schaller, Project Planner     For Adoption By:  Planning Commission

## RECOMMENDED FINDINGS

For the Environmental Review, Find:

1.  That this project is exempt from environmental review pursuant to the California
    Environmental Quality Act (CEQA), Section 15301, Class 1, relating to operation or
    permitting of existing private structures or facilities involving no expansion of use.

For the Use Permit, Find:

2.  That the establishment, maintenance, and conducting of the proposed use will not, under
    the circumstances of the particular case, result in a significant adverse impact, or be
    detrimental to the public welfare or injurious to property or improvements in said
    neighborhood.  The impacts from the continued operation of this facility, subject to the
    recommended conditions of approval, will be minimal.  County staff has received no
    complaints regarding interference with household appliances or communications
    equipment resulting from the antennas.  Because the facility is unmanned and only requires
    periodic service visits, continued operation of the facility should not generate additional
    traffic, noise, or intensity of use of the property.

3.  That the approval of this cellular telecommunications addition is necessary for the public
    health, safety, convenience or welfare.  The use is for telecommunication services.  The
    FCC has established the desirability and need for wireless communications facilities to
    enable communication between mobile units and the existing wire-dependent telephone
    system.  This facility contributes to an enhanced wireless network for increased clarity,
    range, and system capacity, and therefore is a benefit to both public and private users.  The
    wireless network is considered necessary for public health, safety, convenience, and
    welfare, particularly in the case of a large-scale natural disaster, such as an earthquake or
    wildland fire.  No adverse effects to public health and safety will result from the continued
    operation of this facility.

**AR 0446**

**RECOMMENDED CONDITIONS OF APPROVAL**

Planning Department

1. This approval applies only to the proposal as described in this report and plans and documents submitted to the Planning Department on July 14, 2000. Minor adjustments to the project in the course of applying for building permits may be approved by the Community Development Director if they are consistent with the intent of and in substantial conformance with this approval.

2. The applicant shall complete all aspects of the building permit within 4 months of Use Permit Renewal.

3. This Use Permit shall be valid for a 10-year period and shall expire on May 9, 2017. The applicant shall file for a renewal of this permit six months prior to the expiration with the County Planning and Building Department, if continuation of this use is desired. Any modifications to this facility will require a use permit amendment. If an amendment is requested, the applicant shall submit the necessary documents and fees for consideration at a public hearing.

4. The monopoles and antennas shall be repainted in the originally approved and painted color, "enviro-green." Metal fencing with green plastic slats shall be maintained in good condition. Any proposed change to the color shall be reviewed and approved by the Planning Department prior to painting. Any new color proposed shall blend with the character of the site and the vegetation in the vicinity.

5. Construction hours shall be Monday through Friday 7:00 a.m. to 6:00 p.m., Saturday 9:00 a.m. to 5:00 p.m., and no construction will be allowed on Sundays or national holidays.

6. Noise levels produced by the proposed construction activity shall not exceed 80 dBA level at any one moment.

7. The installation shall be removed in its entirety at that time when this technology becomes obsolete or this facility is no longer needed.

8. The applicant shall submit an erosion control plan which implements best management practices to prevent erosion and sedimentation during the entire construction process prior to building permit issuance. The plan shall include, but is not limited to (1) installation of silt blankets and fiber rolls below all areas of earth clearing, (2) covering of surcharges for protection from rain and wind erosion, and (3) replanting all disturbed areas immediately upon completion of construction with indigenous vegetation.

9. During project construction, the applicant shall, pursuant to Section 5022 of the San Mateo County Ordinance Code, minimize the transport and discharge of stormwater runoff from the construction site into storm drain systems and water bodies by:

AR 0447

a.  Disposing of removed soil in a County approved landfill, or by spreading the soil in the immediate vicinity employing the above erosion control techniques at a depth not to exceed 6 inches in height.

b.  Stabilizing all denuded areas and maintaining erosion control measures continuously between October 15 and April 15.

c.  Removing spoils promptly and avoiding stockpiling of fill materials, when rain is forecast. If rain threatens, stockpiled soils and other materials shall be covered with a tarp or other waterproof material.

d.  Storing, handling, and disposing of construction materials and wastes so as to avoid their entry to the storm drain system or water body.

e.  Avoid cleaning, fueling or maintaining vehicles on-site, except in an area designated to contain and treat runoff.

f.  The applicant shall revegetate construction areas with native plant materials (trees, shrubs, and/or ground cover), which are compatible with the surrounding vegetation and are suitable to the climate, soil, and ecological characteristics of the area.

<u>California Department of Forestry</u>

10. Maintain, around and adjacent to, such buildings or structures, a fuel-break/fire break made by removing and clearing away flammable vegetation for a minimum distance of 30 feet. Remove that dead or dying portion of any tree which extends over any structure.

11. All buildings and structures must have an address posted in such a location and in such a manner that it can be easily seen while traveling in both directions on the main road day or night. Numerals shall be contrasting in color to their background and shall be no less than 4 inches in height, and have a minimum stroke of ¾ inch.

12. All proposed enclosed structures on the site shall be equipped with an approved FM 200 fire protection system or equivalent which shall be maintained for the duration of the use permit.

13. Access must be provided from the street to the access gate at the proposed site. The access must be provided in such a manner that emergency crews can get emergency medical equipment and fire fighting equipment to the scene.

14. The existing metal fence with slats shall be maintained to protect the facility.

15. The project site shall remain accessible at all times. If an entry gate is installed then a Knox Box is required at the entry gate to allow emergency personnel access to the site in case of an emergency. Contact the County Fire Department at 650/573-3846 for details.

MJS:kcd - MJSR0462_WKU.DOC

**AR 0448**

Alicia Torre and Jonathan Nimer
1354 Pebble Drive
San Carlos, CA 94070
January 17, 2007

Zoning Hearing Officer George Bergman and
Project Planner Jennifer Cutler
County of San Mateo, Planning and Building Division
455 County Center, 2nd Floor
Mail Drop PLN122
Redwood City, CA 94063          HAND DELIVERED AT THE HEARING 1/18/07

RE:     File No. PLN2000-00497, Applicant Sprint/Nextel at 1175 Palomar Drive


Dear Sir and Madam,

My name is Alicia Torre and I live at 1354 Pebble Drive in San Carlos. I am the property
owner to the north of the subject property and I am speaking on behalf of myself, my
husband Jonathan Nimer, and my family of three teenage boys. My property was
originally on county land in Palomar Park, but was annexed to San Carlos in the mid-90's
by a previous owner.

We oppose the renewal of Sprint/Nextel's Conditional Use Permit for the existing
cellular communications site. I am opposing this renewal because I do not think that the
findings required for the use permit can be made. In addition, this essentially commercial
use is not compatible with the residential nature of the neighborhood, Palomar Park, and
the General Plan is intended to protect existing single-family areas from adjacent
incompatible land uses.

The staff report does not provide adequate support for the required findings. There are
two Recommended Findings for the use permit and the full record, including testimony
from neighbors, does not support either. The first finding requires "That the
establishment, maintenance and/or conducting of the proposed use will not, under the
circumstances of the particular case, be detrimental to the public welfare or injurious to
property or improvements in said neighborhood." (my emphasis). The remaining
language of this finding goes on to focus on maintenance and operations. However, two
property owners have provided testimony that their property value was injured by the
existence of the cellular site. Sally Einspahr of 1165 Palomar Drive stated on the record
that "we lost the sale of our home to a doctor in June of 2005 when he discovered the
antenna that sits on the property line". Our realtor, Melanie Smith, informed us that the
previous owners lost a sale to a couple who rescinded their written offer because of their
concerns about the cellular installations. This direct evidence of injury to property value
was provided in testimony 12/7/06. It is disturbing that the staff has not yet addressed this
issue and simply ignores it in the report. Neighbors' concerns with this impact are not
even mentioned. As the record stands, a finding that the establishment of the proposed

**AR 0449**

use will not be injurious to property cannot be made. On a further note, the statement that "staff has not received complaints regarding its operation or maintenance activities out of compliance with conditions of approval..." is misleading; staff has received complaints about the installation of the pole on the wrong property (clearly out of compliance) and the company's failure to install required landscaping (only corrected when seeking a CUP renewal).

The second finding requires "That the approval of this wireless telecommunications facility is <u>necessary</u> for the public health, safety, convenience, or welfare." (my emphasis) The further language of the proposed finding does not even attempt to defend necessity, but speaks of the cellular facility "enhancing" the wireless network and being a "benefit" to public and private users. Improvement simply does not equal necessity. There is already a T-mobile wireless communication facility on this site. To find that a second cellular site is necessary – a strong word – some other points would need to be established. For example:

(1)   Does the county argue that total cellular coverage is necessary? Most of us who use cell phones are used to occasional poor coverage and redial dropped calls or avoid calling from weak areas. There are already several transmitting installations near highway 280 and Edgewood Road and most neighbors have excellent coverage. I have made cell phone calls on Edgewood Road without being dropped (with Cingular service and there is no Cingular facility at the subject site).

(2)   If the County deems cellular service necessary, does it also think that more than one cellular service in an area is necessary? If the county believes total coverage by all providers is necessary, is it prepared to permit multiple competing company installations throughout residential areas as the cellular companies desire?

(3)   There is no evidence in the record that this particular site is necessary for a wireless facility. Although we all recognize it is on a prominent hill, the applicant has provided no evidence that other locations nearby are unsuitable. Candidate sites include non-residential areas like the hilly Edgewood Park and the Open Space Preserve north of Edgewood Road. This site might have a wider radius of coverage and therefore be more cost-effective to the cellular company, but the test for this finding is necessity not cost-effectiveness.

In short, the record does not provide any evidence that <u>this particular site</u> is <u>necessary</u> for an <u>additional</u> cellular facility.

The staff report states that the use permit was issued under section 6500 of the Zoning Code, presumably under section (b) for the location of public utility or public service uses. However, in section (b) wireless communication facilities are not identified specifically, and all the specific facilities mentioned are linear public utility facilities: electric power <u>lines</u>, gas <u>lines</u>, water <u>lines</u>, and oil <u>lines.</u> An antenna is quite a different facility. Although continuation of an existing linear facility may indeed be necessary to provide service to another neighborhood or house, stand-alone installations like antennas

have much greater flexibility in siting and it cannot be argued that any individual location is necessary in the sense that linear facilities may be.

Finally, I do not think that cellular communications facilities should be sited in residential neighborhoods on properties next door to residences. Although the General Plan does not speak specifically about cellular facilities, it does state that the urban area design concept should "ensure that new development in urban areas is designed and constructed to contribute to the orderly and harmonious development of the locality" (4.35b); that land use designations should be distributed "in order to achieve orderly, understandable, coherent, and workable land use patterns" (7.7); and that land use compatibility should "protect and enhance the character of existing single-family areas" and "protect existing single-family areas from adjacent incompatible land use designations which would degrade the environmental quality and economic stability of the area." (8.14) Allowing multiple cellular facilities on a single residential property is inconsistent with these provisions.

Finally, given the existence of the T-mobile facility on this property already and Sprint/Nextel's blatant disregard for county conditions of approval, the county should not renew its use permit. There is already a cellular site at the property and more are not necessary. The applicant ignored the county's landscaping requirement for almost two years and has been out of compliance with its permit conditions regarding pole placement for more than five years. Sprint/Nextel has failed to move its pole on the Einspahr property even though it is aware of the trespass. This is not a responsible record and the county should punish the Applicant's disregard for the permit conditions by not renewing its use permit. Section 6505 of the Zoning Regulations allows revocation of use permits when the terms of the use permit are violated and non-renewal is an even milder act.

In sum, we ask you to deny Applicant's request for a renewal of its use permit for the Sprint/Nextel cellular facility.

Thank you.

Sincerely yours,

Alicia Torre        and        Jonathan Nimer

P.S. Please see attached handwritten sheets.

**AR 0451**

3

(4) Applicants for a wireless facility site need to submit "an application showing, to the best of the applicant's knowledge, all sites anticipated" to be required by the carrier for a five year period, and the requests shall be reviewed by the Planning Commission as a Master Plan application."

The Woodside code has other requirements as well, but the sections above require wireless company applicants to notify the permitting authority of its overall plan and to work hard to find sites that do not impact residences.

I urge the county to develop a general policy for specifically for wireless communications facilities now and to put a moratorium on cellular facilities contiguous to residences in the meantime. Although this will take time and work, I believe it will save time and money in the long run for both staff and the affected companies. It will also make good on the General Plan commitment to protect existing single family areas from adjacent incompatible uses.

AR 0452

Addendum to Letter

This application for renewal raises a more general policy issue for the county. Technology and community practices change, and we have heard some of the wireless company representatives state that they want to locate poles in residential areas to provide residential coverage to customers. The county needs to be proactive in addressing this change in technology and develop a county-wide policy for wireless communication facilities, as has been done by some of the neighboring jurisdictions.

In that regard, I bring to your attention the Woodside code (section 153.400) and some of its relevant features:

(1) It establishes priority for siting which favors town-owned property and other public facilities.

(2) It does not permit wireless facilities on residential property unless the carrier "demonstrates that all alternative non-residential sites (including co-location) have been explored and are not technologically feasible for use" and no significant visual impacts occur.

(3) An environmental impact analysis under CEQA is required and categorical exemptions are only allowed where facilities are co-located or are minimal additions to existing structures with negligible visual impact.

AR 0453

Alicia Torre and Jonathan Nimer
1354 Pebble Drive
San Carlos, CA 94070
March 7, 2006

Zoning Hearing Officer and
Project Planner Jennifer Cutler
County of San Mateo, Planning and Building Division
455 County Center, 2nd Floor
Mail Drop PLN122
Redwood City, CA 94063                    HAND DELIVERED AT THE HEARING 12/7/06

RE:     File No. PLN2000-00497, Applicant Sprint/Nextel at 1175 Palomar Drive
        File No. PLN 2005-00261, Applicant MetroPCS at 1175 Palomar Drive
        File No. PLN2005-00306, Applicant Verizon Wireless at 1175 Palomar Drive

Dear Sir and Madam,

My name is Alicia Torre and I live at 1354 Pebble Drive in San Carlos. I am the property
owner to the north of the subject property and I am speaking on behalf of myself, my
husband Jonathan Nimer, and my family of three teenage boys. My property was
originally on county land in Palomar Park, but was annexed to San Carlos in the mid-90's
by a previous owner.

I did not originally expect to come down here to speak in opposition to the MetroPCS and
Verizon project applications. I am doing so because I believe that the tremendous
expansion of the existing wireless communications use is not in keeping with the low
density residential area of Palomar Park and the county general plan. In addition, the
project analysis is flawed because (1) the cumulative impact of all 4 cellular
communications installations is never analyzed, (2) the impact of this much construction
on the septic system leach field is never considered, (3) the impact of this much
construction on the existing trees is not properly considered, and no arborist's report is
provided, and (4) injury to neighborhood property values is not addressed.

First, let me address the existing site conditions. The existing T-mobile and Sprint
equipment enclosures and the northern poles are somewhat screened from our view by
mature trees. The Sprint pole to the southwest is out of compliance with the permit and
not screened from view, in part because the required landscaping, a condition of the
permit, was never installed. Although my husband and I don't particularly like the
existing communications use, we are not opposing the Sprint project if it is brought back
into compliance with the original permit with regard to pole placement and landscaping.
We also believe additional landscaping should be provided between the pole and the
Einspahr property.

The proposed approval condition 1 should be altered so that compliance is not dependent
upon approval of the Verizon plan. The incorrectly located antennae should be relocated

**AR 0454**

(1) The subject property has a septic system and leach field. Where is it and how will it be impacted by the proposed construction? A negative impact to the leach field would be detrimental to the public welfare.

(2) Currently there are mature trees on the site which help mitigate the visual impact of the existing installations, as noted in the report. On the one hand , the report states that no tree cutting is allowed and that a boring method rather than trenching should be used for the underground services to minimize impacts to the existing root systems. But it goes on to recognize that removal of a tree might be necessary and notes how the proposed MetroPCS equipment shelter is close to a 20-inch pine. The plans call for enclosures and borings within the root areas of mature trees – the county should require a certified arborist's report that the combined plans will not be detrimental to the existing trees before approving the projects. Cutting down or killing trees which help hide the project is detrimental to the public welfare and to property values.

(3) The radio frequency exposure analysis evaluates the cumulative level at ground, but not at the second floor elevations at nearby homes. My bedroom on the second floor is close to some of the installations and given the more than doubling of the ground-level exposure, I don't find the blithe statement that the maximum exposure is "expected" to be below the public exposure limit reassuring without actual analysis.

(4) The report provides no analysis of impacts to neighbor's property values from the creation of an antenna farm on the subject property. The existing facilities have already impacted property value, and more than doubling the current installations is likely to increase that impact substantially. Let me provide some support for this assertion. I am reading a telephone communication from Melanie Smith, the Coldwell Banker Realtor who was my agent in the purchase of 1354 pebble Drive: "I was told by the previous owner's listing agent, Tom Neel of Coldwell Banker Burlingame, that the previous buyer in 2003, a couple who were in contract with the owner prior to the Torre-Nimer family, rescinded their offer because of their concerns about the cellular installations in close proximity to the 1354 Pebble Drive property." How can the Hearing Officer make a positive finding that there is no injury to property in the neighborhood in light of this evidence, and no discussion in the staff report?

In sum, my husband and I oppose the new applications by MetroPCS and Verizon. We think that Sprint should be required to relocate the pole that is located on the Einspahrs'property and comply with the landscaping plan that was a condition of permit receipt. Additional landscaping between the pole and the Einspahr property should also be required as a visual mitigation.

If the Hearing Officer is not convinced that the proposals should be denied outright, then at a minimum the hearing should be continued to a later date when the applicant and planning staff can provide the following additional analysis:

3

**AR 0455**

# Palomar Property Owners
419 Palomar Drive
Palomar Park, CA  94062

March 6, 2007

Peacock Associates, Inc.
5900 Hollis Street, Suite R1
Emeryville, CA  94608

Attn.:        Jane Weller

Re.:          Proposed Verizon Wireless facility at 1175 Palomar Drive

Dear Ms. Weller:

The Palomar Property Owners Board of Directors thanks you for your letter extending an invitation to discuss the proposed Verizon Wireless project at 1175 Palomar Drive.  We have more concerns than questions about the proposal and it isn't that we are totally opposed to the use and installation of cellular systems.  However, we are not in favor of an obvious commercial operation located within a zoned residential area.  The installation of towers, poles and related equipment and enclosures has a negative visual impact on surrounding properties as well as denigration of neighboring property values.

We also fully understand that the zoning code makes allowance for violating a residential zoned area to install a wireless system with the underlying requirement—as far as we are concerned—that there is little or no chance of providing that service to the area from any other location.  So far, we have seen no evidence that the area to be served from 1175 Palomar Drive can only be accomplished by locating the wireless equipment at that particular property.  We are however, positive that sites other than those located within the residential area are available for the installation of a commercial wireless facility.

I will share your invitation with the community and contact you if anyone is interested in hearing your presentation.

**AR 0456**

Sincerely,

Richard Landi, President


Cc:    Mike Schaller, Sr. Planner, San Mateo County
       Supervisor Rich Gordon
       Supervisor Jerry Hill
       Alicia Torre, 1354 Pebble Drive
       Sally Einspahr, 1165 Palomar Drive


**Board of Directors**
Jeff Garratt, Leon Glahn, Emile Kishek, Richard Landi, Carol Mondino,
Daniel Petelin, Tom Rice, Trish Taylor, Bernie Wooster-Wong

**San Mateo County Environmental Services Agency**

# Application for Appeal

☒ **To the Planning Commission**

☐ **To the Board of Supervisors**

**Planning and Building Division**

County Government Center ▪ 455 County Center, 2nd Floor
Redwood City ▪ CA ▪ 94063 ▪ Mail Drop PLN 122
Phone: 650 ▪ 363 ▪ 4161 Fax: 650 ▪ 363 ▪ 4849

### Appellant Information

Name:   **Palomar Property Owners**

Phone:~~W~~  **R. Landi, Pres.**  H:  **365-4184**

Address:   **419 Palomar Drive**

**Palomar Park**

Zip:      **94062**

### 2. Appeal Information

Permit Numbers involved:

**Use Permit Renewal**

**File No. PLN2000-00497**

I hereby appeal the decision of the:

☐   Staff or Planning Director
☒   Zoning Hearing Officer
☐   Design Review Committee
☐   Planning Commission

made on  **1/18**  20 **07** , to approve/deny
the above-listed permit applications.

I have read and understood the attached information regarding appeal process and alternatives.

☒   yes              ☐   no

Appellant's Signature:

*Richard A. Landi*

Date:  **1/31/07**

### 3. Basis for Appeal

Planning staff will prepare a report based on your appeal. In order to facilitate this, your precise objections are needed. For example: Do you wish the decision reversed? If so, why? Do you object to certain conditions of approval? If so, then which conditions and why?

**See Attachment A**

**AR 0458**

# San Mateo County

**Planning & Building Department** ▪ 455 County Center ▪ Redwood City
California 94063 ▪ Planning: 650/363-4161 ▪ Building: 650/599-7311 ▪ Fax: 650/363-4849

## **Payment Receipt**

Check Number # : 0367

Receipt # : 00000000000000038857

**Name :**   SPRINT
**Address :**   1175 PALOMAR DR

**Parcel#: 051416040**

| Case # Number | Account Number | Description | Date Paid | Amount Due | Amount Paid |
|---|---|---|---|---|---|
| PLN2000-00497 | 38450-2116 | Appeal Fee | 2/1/2007 | 451.00 | 451.00 |
| | 38450-2093 | 5% Legal Counsel Surcharge Fee | 2/1/2007 | 22.55 | 22.55 |

**Total Paid:** **$473.55**

FeeReceipt.rpt

**AR 0459**

*Project Plan file*

# PROJECT FILE

**Attachment A**

RECEIVED
2007 FEB 15 P 4: 04
SAN MATEO COUNTY
PLANNING DIVISION

## PALOMAR PROPERTY OWNERS

419 Palomar Drive
Palomar Park, CA  94062

January 31, 2007

Planning Commission
County of San Mateo
455 County Center
Redwood City, CA  94063

Subject:    Appeal of Use Permit Renewal
            PLN 2000-00497
            1175 Palomar Drive, APN 051-416-040

Honorable Commissioners:

Palomar Property Owners (PPO) wishes to appeal the decision made by the Zoning
Hearing Officer in the above referenced hearing.   We request that the decision be
reversed and the application for renewal be denied.

1.      We are not convinced that the findings of the Zoning Hearing Officer established
the legality of the  original cellular facility upon which all of the subsequent operating
permits were based as "existing facilities".  The earliest reference to the existing facility is
in the November 2, 2000 hearing which states that on May 22, 1997 Use permit
approved by the Zoning Hearing Officer for the "existing Pacific Bell Cellular facility."
How did the Pacific Bell Cellular facility get there?  If the Hearing Officer cannot produce
any evidence of an original permit or zoning approval, the existing antenna installation
at 1175 Palomar Drive constitutes an illegal zoning nonconformity.  The explicit purpose
of Zoning Regulation Section 6130 is to phase out these non conformities.

2.      The subject request should be for a "Use Permit" instead of "Renewal" as the
present system is operating without a valid Use Permit.  On November 2, 2000, a Use
Permit was issued valid for a five year period expiring on November 2, 2005.  The Use
Permit contained the additional stipulation that "The applicant shall file for a renewal of
this permit six months prior to the expiration date with the County Planning and

**AR 0460**

Building Division if continuation of this use is desired." The renewal application was submitted on February 23, 2006, almost ten months beyond the specified time for renewal and four months after the expiration of the Use Permit. The application for renewal is invalid.

3.     The Use Permit, expiring on November 2, 2005, should not have been finalized or should have been revoked earlier.

      a. Site conditions as required by the Use Permit issued in year 2000 have never been met. One of the two antennae poles is located approximately 4 feet from the approved plan location, violating setback requirements as well as the approved plan and is physically located on a neighbors' property.

      b.     The landscape plan approved as part of the cell sites building permit on May 14, 2004 was never implemented during the time period of the Use Permit.

4.     Under the intent of the provisions of Section 6500 (Use Permits) which are being used to govern the installation of wireless communication systems in areas zoned 1/S-101DR, permits must not be issued without due consideration of the existing zoning requirements and the necessity of using this particular site. Neither of the two findings required for the Use Permit can be made.

      a. The first finding requires "That the establishment, maintenance and/or conducting of the proposed use will not, under the circumstances of the case be detrimental to the public welfare or injurious to property or improvements in said neighborhood."

            1).     Regardless of the actual level of the Radio Frequency emissions and the assurance of the operators of such systems that there is no problem, the neighbors in the area and general public are concerned about the effect on them and their children and if at all possible remove themselves from the area. Property values do decline and people are inconvenienced.

            2).     Property values also decline due to the presence of antennas and enclosures in their neighborhoods as evidence of the requirements for special landscaping, shapes and colors to prevent the neighbors and general public from seeing the equipment. It was reported by staff that no comments concerning this site were received from the public during the Use Permit period but as noted earlier the requr9ement for landscaping was imposed in 2004 in response to public protest.

            3).     Related to this site,  two contiguous landowners have both

**AR 0461**

presented evidence of property sales that were not consummated due to prospective buyers' concerns about the wireless facilities. This is evidence of direct injury to property owners, but this evidence has so far been completely ignored in the staff reports and the proposed findings.

b.      The second finding requires "That the approval of this wireless telecommunications facility is necessary for the public health, safety, convenience, or welfare."

1.      No evidence has been presented proving that this particular site is necessary for the public health, safety, convenience or welfare of the public. The staff report only asserts that it would result in an "enhanced network" which is a "benefit." This site is not unique in its ability to provide the desired wireless service to this area. Sites are available that are not within the area zoned R-1/S-101DR and it is not evident that the applicant has been required to carry out this investigation. Residential areas should not be violated in order to provide enhanced operation to commercial entities.

5.      In support, the General Plan although it does not speak specifically about cellular facilities, it does state that the urban area design concept should "ensure that new development in urban areas is designed and constructed to contribute to the orderly and harmonious development of the locality" (4.35b); that land use designations should be distributed "in order to achieve orderly, understandable, coherent, and workable land use patterns" (7.7); and that land use compatibility should "protect and enhance the character of existing single-family areas" and "protect existing single-family areas from adjacent incompatible land use designations which would degrade the environmental quality and economic stability of the area." (8.14) These facilities under consideration, are moneymaking ventures for the property owners who earn annual fees for allowing this use of their property, unlike electrical, telephone and gas lines.

6.      Additional questions subject to discussion:

a.      Does the Building Site Coverage Area Ratio adhere to the requirements in Section 6300.10.50?

b.      Does the Building Floor Area adhere to the requirements of Section 6300.10.60?

c.      There are indications that there are building permit violations on the property. Section 6105.1 stipulates that no permit may be issued for any property that has existing building or zoning violations. As such, the permits must be withheld.

**AR 0462**

7.    There can be found no evidence that this facility was reviewed by the Design Review Committee which is required prior to issuing a building permit.

8.    Concern also exists that the Use Permit for these facilities in year 2000 was originally permitted relying in part on a misleading document from Palomar Property Owners (PPO). Following questions from the audience at an earlier meeting concerning approval by PPO of the Use Permit in year 2000, the Zoning Hearing Officer stated on the record January 4, 2007, that the County had received a letter which said PPO did not oppose the cellular installation. He also now acknowledged that this letter was signed by the site owner who was, at the time, President of PPO. PPO has diligently searched its records and there is no record of notification to PPO of the planned Use Permits by either the County or the site owner/President nor is there any record of support or opposition being discussed at any board meeting. In searching PPO records, it was also discovered that PPO's mailing address had been diverted to the site owners/Presidents' home thereby preventing any notification from the County reaching any other Board member. The mailing address has been corrected and mail is now being directed to PPO's legal mailing address.

The information provided above clearly demonstrates the absence of sufficient legal grounds for the granting of a Use Permit and/or renewal of the Use Permit. In the absence of the proper foundation for the granting of a Use Permit, it is the recommendation of the Board of Directors of Palomar Property Owners that the application for renewal be denied.

Sincerely,

Richard G. Landi, President

**Board of Directors**
Jeff Garratt  •  Leon Glahn  •  Emile Kishek  •  Richard Landi  •  Carol Mondino
Daniel Petelin  •  Tom Rice  •  Trish Taylor  •  Bernie Wooster-Wong

cc:    Supervisor Richard Gordon
       Supervisor Jerry Hill

# PALOMAR PROPERTY OWNERS
### 419 Palomar Drive
### Palomar Park, CA  94062

January 15, 2007

County of San Mateo
Environmental Services Agency
Planning and Building Division
455 County Center, 2nd Floor
Redwood City, CA  94063                         Via fax 363-4849 & delivery

Attn.:          Mr. George Bergman, Zoning Hearing Officer

Subject:        Use Permit Renewal
Owner:          Curtis Brooks
Applicant:      Sprint/Nextel
File No.:       PLN 2000-00497
Location:       1175 Palomar Drive, Palomar Park, APN 051-416-040

Dear Mr. Bergman:

Palomar Property Owners (PPO) is a non-profit California corporation, established:
(a)  To further at all times better living conditions and physical surroundings by evaluating
     and determining appropriate measures to maintain and enhance the quality and safety
     of the environment in Palomar Park;
(b)  To present to appropriate public officials and agencies the views and opinions of property
     owners in Palomar Park with a view to the improvement of conditions in the area;
(c)  To provide a means of keeping the property owners in Palomar Park adequately informed
     on all matters of common interest.

Under its obligations as spelled out in this excerpt from the PPO Bylaws, Palomar Property
Owners wishes to go on record with its recommendation that approval of the above referenced
request be denied.

This recommendation is based upon the following:
     The PPO Board believes that, under the intent of the provisions of Section 6500 (Use
     Permits) governing the installation of wireless communication systems in areas zoned

**AR 0464**

1/S-101DR, permits must not be issued without due consideration of the existing zoning requirements <u>and</u> the necessity of using this particular site. The Board also believes that this site is not unique in its ability to provide the desired wireless service to this area. Sites are available that are not within the area zoned R-1/S-101DR. The Board does not believe that the residential areas need to be violated in order to provide the most efficient method of operation to commercial entities.

No correspondence can be found in the Board's files
- Dated around May 22, 1997, relating to the approval of a use permit approved by the Zoning Hearing Officer for the existing Pacific Bell Cellular facility
- concerning approval of the installation of the "existing Pacific Bell Cellular facility"
- concerning the application, staff report and approval of the year 2000 permit for installation of a wireless communication system.

The Palomar Property Owners Board of Directors was appalled to find that the requirements for landscaping as part of the 2000 permit had not been enforced.

Equally appalling is the location of the antenna pole, approved in the year 2000 permit, which not only *did not meet the setback requirements* but was *located on a neighbors' property*.

In the Board's Design Review Committee files, no reference can be found to any consideration of the installation of wireless system in the year 2000.

On behalf of the Palomar Property Owners Board of Directors I respectfully request your thorough consideration of this request to deny the Use Permit Renewal cited above.

Sincerely,

Richard Landi

Richard Landi, President

**Board of Directors**
Jeff Garratt  •  Leon Glahn  •  Emile Kishek  •  Richard Landi  •  Carol Mondino
Daniel Petelin  •  Tom Rice  •  Trish Taylor  •  Bernie Wooster-Wong

copy:    Supervisor Rich Gordon
         Supervisor Jerry Hill





AR 0466





AR 0467





AR 0468





AR 0469

**FROM:**              Lloyd and Sally Einspahr
                       1165 Palomar Dr.
                       Redwood City, CA  94062
                       650-365-2820

**TO:**
Zoning Hearing Officer, Attn:  Project Planner Michael Schaller
County Office Building
455 County Center
Redwood City, CA  94063
650-363-1862

REF:   Consent Agenda of Dec. 7, 2006 – Item # 3

**Item #3        Owner Curtis Brooks**
**                 Sprint/Nextel**
**                 File No.  PLN 2000-00497**
**                 Continued operation of site**

I would like to state for the record:

Our house sits on the Southeast side of Mr. Brooks' property.

**We did not oppose the original Item #3 installation, as we were not aware of the
health effects from exposure to low-level radio frequency electromagnetic fields.
Please see your attached research on exposure to low-level RF fields.**

**However; we now feel, after research, that there are health hazards with RF fields.**

Mr. Brooks and Sprint/Nextel are claiming there are:

                       2 Monopoles of 13'
                       1 Equipment Enclosure

**In reality there are:  2 Enclosures shown in pictures #1 and 1-A – one housing a
round antenna and the other housing a very large generator .  – Pictures #2 and #3
show Monopoles of 13', with 2 panels each for a total of 4 panels.  Picture  #4 shows
one round antenna pole in a wooden enclosure – Picture #5 shows the antenna pole
and panels that face our house with the relation to the roofline.  Picture #6 shows
the Northwest side antenna pole with 2 panels, and picture #7 shows – thru the trees
- how that antenna faces the neighbor's bedrooms of their home.**

**I would like to oppose the continued use of the permit on Item #3, for health
reasons.  If schools won't have antennas on their property - why do we have them in
our residential neighborhood?**

Thank you,

Lloyd and Sally Einspahr
Enc:  7 Pictures & Low Level RF Field Docs                Dec. 4, 2006

**AR 0470**

guidelines, has stated that the guidelines include "<u>no consideration regarding prudent avoidance</u>" for health effects for which evidence is less than conclusive.

## *Should we allow ourselves to take this risk?*

## *Should we allow our children to take this risk?*

 School buildings, youth centers, and other places where children are found are not the proper place for a technology which could endanger health and well being.

As noted at the start of this brief review, our School Board was told none of this when they were asked to decide on the siting of the cellular phone antenna. The "Safety Analysis" they received was not an honest attempt to explain the health effects of RF exposure, but rather a sophisticated "sale's pitch" designed to blind the Board to the real questions and uncertainties. While such behavior in an attempt to "make a sale" can never be condoned, in the case of the suppression of information about possible adverse health consequences for the children of our schools, it is unconscionable. Our children and their parents stand defenseless before such a strategy.

1. "Safety Analysis of the Electromagnetic Environment in the Vicinity of a Proposed Personal Communications Services Base Station, Site 06-4601: Ossining High School, Ossining, New York" prepared by the Wireless & Optical Technologies Safety Department of Bell Laboratories for Sprint Spectrum L.P.

2. An international blue ribbon panel assembled by the <u>National Institute of Environmental Health Sciences (NIEHS)</u> designated power frequency electromagnetic fields (EMF) as "<u>possible human carcinogens</u>" on June 24, 1998. The panel's decision was based largely on the results of epidemiological studies of children exposed at home and workers exposed on the job. The evaluation of the EMF literature followed procedures developed by the International Agency for Research on Cancer (IARC), based in Lyon, France. The working group's report will be the basis for the NIEHS report to Congress on the EMF Research and Public Information Dissemination program (EMF RAPID). The <u>National Radiological Protection Board (NRPB) of the United Kingdom</u> noted that the views of its Advisory Group on Non-Ionizing Radiation are "consistent with those of the NIEHS expert panel."

AR 0471

Case 4:08-cv-00342-CW     Document 31-12     Filed 07/21/2008     Page 32 of 63

should be conducted on people reporting these effects; cohorts with high occupational RF exposure for changes in cancer incidence; adverse pregnancy outcomes in various highly RF exposed occupational groups; and ocular pathologies in mobile telephone users and in highly RF exposed occupational groups.

Received: 31 March 1997; Revised: 8 May 1997
**DIGITAL OBJECT IDENTIFIER (DOI)**

10.1002/(SICI)1521-186X(1998)19:1<1::AID-BEM1>3.0.CO;2-5

### Related Articles

o  Find other            like this in Wiley InterScience

o  Find articles in Wiley InterScience written by any of the

Wiley InterScience is a member of CrossRef.



See OnlineBooks
from Wiley InterScience in...



See OnlineBooks
from Wiley InterScience in...



Backfiles on Pay-Per-View

More than 600,000 journal articles starting at Volume 1, Issue 1, dating as far back as 1800s and spanning the disciplines of chemistry, life sciences, medicine and materials science are now available online for Pay-Per-View purchase on Wiley InterScience.

© 1999-2006

All Rights Reserved.

**AR 0472**

Case 4:08-cv-00342-CW     Document 31-12     Filed 07/21/2008     Page 33 of 63



Williston Park Neighbors

Compiled by Dr. Grahame Blackwell
February 21, 2005, updated May 2, 2005

Dr. Blackwell points out that these are the *only* studies known of that specifically consider the effects of cellular towers on people. **All six of these studies show clear and significant ill-health effects.** There are *no* known studies relating to health effects of cellular towers that do not show such ill-health effects.

Dr. Blackwell warns that any statement by industry or official sources that claims (or suggests) that: "There is no evidence of ill-health effects from cellular towers" or "the overwhelming evidence is that cellular towers do not cause ill-health effects" is completely and blatantly untrue.


## Six Studies Showing Ill-Health Effects From Cellular Towers

### 1. Study of the health of people living in the vicinity of mobile phone base stations.

Santini et al.
Pathol Biol (Paris) [Pathologie Biologie (Paris)] 2002; 50: 369 – 73
Found significant health effects on people living within 300 meters of mobile phone base stations.

Conclusions include the recommendation:
"… it is advisable that mobile phone base stations not be sited closer than 300 meters to populations"

### 2. "Effects of Global Communications System Radio-Frequency Fields On Well Being and Cognitive Function of Human Subjects With and Without Subjective Complaints"

(September 2003)

Netherlands Organization for Applied Scientific Research (TNO)
Study for the Netherlands Ministries of Economic Affairs, Housing, Spatial Planning and the Environment,and Health, Welfare and Sport

**AR 0473**

## DOCTORS CAUTION ABOUT CELL TOWER PLACEMENT

From *Network News,* Fall 1997, p. 15., newsletter of The EMR Alliance.

**Kathleen M. Fagan, M.D., M.P.H.**
Medical Director, Division of Occupational and Environmental Medicine
Cleveland, Ohio
Excerpted from a letter dated June 13, 1997

I am a physician specializing in the field of Occupational and Environmental Medicine. My training includes special study in such areas as toxicology, radiation exposure, epidemiology and public health.
... I recommend prudent avoidance of microwave and RF (radiofrequency) exposure especially with children as the receivers. I strongly urge you to consider the possible health effects of RF exposure in the plans for the construction of towers to receive and transmit RF and microwaves. These towers should be located so as to minimize exposure to people in schools, homes, apartments, offices and factories.
Other alternatives should be considered before advancing in the plans to construct any towers on schools. For example, collocation with other existing towers, building on landfill property, and other non-residential areas are a couple of choices to consider before putting children at risk.
We clearly live in a time of rapid technological advance. With all the advantages that such progress brings, we have also witnessed all too often the adverse human health and environmental effects created by hurried, ill-conceived planning. I ask you to consider all the public health implications of the proposed microwave and RF transmitting towers.

**Sheldon Benjamin, M.D.**
Chair, Health and Safety Commission
Ward Seven Neighborhood Association
Chestnut Hill, Massachusetts
Testimony before the Zoning & Planning Committee of Newton Board of Alderman
Dated May 15, 1991

I am a neuropsychiatrist and have been following the literature on electromagnetic fields and health risks , , , There has been a steady stream of reports of possible health risks associated with exposure to electromagnetic fields and MW/Rf (microwave/radiofrequency) radiation from power substations, high voltage lines and microwave towers. Most frightening of these are the possible increases in the risk of cancer and childhood leukemia. Although the health risks have not yet been established beyond a shadow of a doubt, the association is strong enough to have many epidemiologists and experts in the field concerned enough to advocate a policy of prudent avoidance. This means constructing only those facilities absolutely necessary to the public safety and constructing these with care to minimize health risks.
... In summary, we feel that cellular biology, animal and human studies show that MW/RF exposure presents a health risk at the power levels of the proposed antenna and even at the power levels of the existing antenna . . . Increased numbers of cancers have been found in populations exposed to less radiation than we are receiving now . . . Our review of the literature on MW/RF exposure has led us to the sobering conclusion that living in close proximity to a source such as the proposed NYNEX/Newton antenna on Waban Hill will increase the risk to ourselves and to our children of developing cancer.

**David O. Carpenter, M.D.**
Director of the Institute for Health and the Environment
State University of New York at Albany
Excerpted from a letter to the Planning Commission and City Council of San Rafael, California
Dated June 13, 1997

In my view, it is totally irresponsible to position a cellular antenna near a site where children spend significant periods of time. While I am not saying that the association between these exposures and childhood cancer is proven beyond any shadow of a doubt, I do see evidence to be suggestive. When children's health is concerned, I strongly feel that our society must be cautious so as not to increase the chances of their developing cancer or other health effects.

AR 0474





AR 0475





AR 0476



Raural
antenna



1165 Palomar
Einspahr House

AR 0477





**FROM:**    Lloyd and Sally Einspahr
1165 Palomar Dr.
Redwood City, CA  94062
Phone  650-365-2820

**TO:**
Zoning Hearing Officer - Project Planner Michael Schaller
County Office Building
455 County Center
Redwood City, CA  94063
650-363-1862

REF:  Consent Agenda of Dec. 7, 2006 Items 4 and 5 on the Agenda

## WE ARE OBJECTING TO THE FOLLOWING:

**Item #4**    Owner Curtis Brooks
Metro PCS
File No.  PLN 2005-00261

New construction of cellular communication facility consisting of:
2 – 15' Monopoles with 3 panel antennas mounted (6 panels total)
1 Equipment Enclosure of 10 X 14 feet

**Item #5**    Owner Curtis Brooks
Verizon Wireless
File No.  PLN 2006-00306

New construction of cellular communication facility consisting of:
2 – 17' Monopoles with 3 panel antennas mounted (6 panels total)
1 Equipment Enclosure of 10.5 X 15 feet
**1 – 25' replacement pole for existing Sprint antenna (2 panels total)**
**(this antenna now sits on our property line)**

As the Zoning Board knows Palomar Park is a residential area, within San Mateo County, with single-family dwellings.  Our house sits to the Southeast of Mr. Brooks' property.  At our end of Palomar Dr., the road is maintained by the private residences.

**Since Mr. Brooks already has:**
**2 Enclosures**
**2 Monopoles of 13' with 2 panels each (total of 4 panels)**
**1 Round Antenna**

**by adding the following:**

**Item #4:**    **2 more 15' poles with 3 panels each (6 panels total)**
**1 more Equipment Enclosure 10 X 14 feet**

**and**

Page 2 of 2
Zoning Hearing of Dec. 7, 2006
Attn: Project Planner Michael Schaller

| Item #5: | 2 more 17' poles 3 panels each (6 panels total)<br>1 more Equipment Enclosure of 10.5 X 15 feet<br>1 – 25' pole to replace existing pole of approximately 13 feet |

**would make far too many cell antenna poles and panels for a residential neighborhood.**

**Items 4 and 5 would add 4 more poles – with taller poles (15' and 17'), holding 12 more panels, and 2 more large equipment enclosures. Item 5- would replace an existing 13' pole (with 2 panels) to a 25' pole.**

We lost the sale of our home to a doctor in June of 2005, because of his concerns regarding low-level radio frequency radiation from the cell antennas sites on an unborn fetus.

We were told in June 2005, by Mr. Brooks, there were plans to move the antenna that sits on the property line by relocating that particular antenna 5 feet toward his property. At that time there was nothing said about a 25' pole being installed to mount the antenna panels on. If a 25' pole is used it will compound the radiation on our home. **We are shocked that one would even suggest the use of a 25' pole in a residential neighborhood.**

A 25' pole would send a larger unknown health hazard not only over our house, but also over the entire neighborhood, as it would be taller than Mr. Brooks' house.

Granted Mr. Brooks has some nice flat ground on his property, but **this proposed "Antenna Farm" of Mr. Brooks is not acceptable for a residential neighborhood**. If this new construction and installation are approved it will continue to **de-value** our home price as well as the prices in the whole neighborhood.

**Mr. Brooks would be compensated very nicely for the use of his land for these antennas while his neighbors would be facing health hazards of unknown proportions.**

**We cannot let this construction and installation be approved, as there are too many unknown health hazards.**

**My husband and myself are asking the Zoning Board to refuse Item #4 and Item #5 on the Consent Agenda and to stop any further or future construction and installation of cell communication facilities at 1175 Palomar Dr.**

Thank you,

Lloyd and Sally Einspähr
1165 Palomar Dr.
Redwood City, CA 94062
650-365-2820
Date: Dec. 2006
Enc: Support Docs: Dangers of Cell Towers

**AR 0480**

# ELECTROMAGNETIC FIELDS AND YOUR HEALTH

By John Iovine, From "Popular Electronics" March 1993

There is a growing concern over possible health hazards from low-frequency electromagnetic fields. When the story first broke, the fields of greatest concern were those given off by overhead power line transformers.

At the time, the reasoning was unless you worked in the electronics field or lived in close proximity to power lines, you could consider yourself unaffected and relatively safe. New evidence suggests that it really isn't the case. It appears that the ELF (extremely low-frequency) magnetic fields given off by many household appliances and computer monitors can be of sufficient strength to be considered potentially hazardous.

For those of us who dabble in electronics, or earn our livelihood in electronics or a related field, the concern becomes more prominent. That being the case you should be aware of what research has taken place and what's been reported thus far.

**Why Worry Now?** You might be wondering if ELF radiation is such a health hazard, why has it taken so long for anyone to mention its dangers? To answer that question, we must look at how scientists first sized up the potential harm of low-frequency magnetic fields.

To begin with, it was originally believed that weak low-frequency fields could not have a significant impact on living systems. This belief was based on the amount of thermal energy the ELF fields could produce in biological tissue. The energy produced by ELF radiation is much smaller than the normal thermal energy internally generated by a cell's metabolic process. In addition, the quantum energy of the fields is far too low to break any chemical or nuclear bonds in the tissue. Therefore, scientists felt DNA would be safe from mutating. Finally the electric field of the body is much greater than the induced field from ELF radiation. Looking at all these factors, it's easy to understand why the scientific community quickly dismissed epidemological studies that indicated a statistically significant hazard associated with ELF radiation.

As a result, the scientific community has of late been portrayed in the press as a bunch of hacks or bureaucratic puppets genuflecting for grants from government agencies and power companies. However, the reason for the quick dismissal was one of genuine disbelief, not a mass cover up. Although in truth, a few scientists have stepped over the line and maligned good researchers based upon the profit and loss statements of their employers. These scientists are few in number and the entire scientific community should be condemned based upon their isolated unethical endeavors.

**The Real Deal**. Although the mechanism by which ELF fields affect biological tissue is still not exactly known, it has been unequivocally shown that cells are affected. The best research to date shows that a cell's membrane, or receptor molecules in the membrane, are sensitive to extremely weak low-frequency magnetic fields.

Some of the effects reported so far include changes in the flow of ionic compounds through cellular membranes. Also noted are changes in DNA synthesis, RNA transcription, and the response of cells to signaling molecules such as hormones and neurotransmitters. In addition, changes have been noted in

**AR 0481**

the kinetics of some cellular biochemical reactions.

Not all ELF radiation produces all of those effects, it's more complex than that. Some effects are only noted at discrete frequencies and amplitudes of the magnetic field. Others depend on the strength and orientation of an ambient constant magnetic field. Still others require a threshold of exposure time rather that field strength.

The inherent danger or increased likelihood of various forms of cancer due to ELF radiation has been emphasized in the press. As stated previously, the quantum energy of these fields isn't sufficient to produce any type of chromosomal damage. Simply, that means that ELF radiation doesn't initiate cancer. The increased incidence of cancers is due to the fact that ELF radiation can promote the disease after the cancer has been triggered by another agent. The cancer is promoted because ELF radiation can suppress the body's immune system. In addition, it has been determined that at the cellular level the ELF fields increase the production of the enzyme ornithine decarboxylase, which has been cited to support the promotion of cancer in the body.

**The Evidence.** As studies progress, more information will be forthcoming. Here is a short list of reported events that indicates the potential hazards of ELF fields:

- In 1972, Soviet researchers linked electromagnetic fields with low grade health problems such as fatigue and headaches.
- In 1977, Robert Becker, physician and biophysicist Andrew Marino testified before the New York State Public Service Commission about the results of their experiment that showed negative health effects due to exposure to ELF fields.
- In 1979, Nancy Wertheimer an epidemiologist and physicist Ed Leeper published a study that showed a statistical link between childhood cancers and the proximity of certain types of high-current power lines to the home.
- In 1982, a Washington State study examined the data for the deaths of 438,000 workers in the State occurring between 1950 and 1979. The results of the study showed that leukemia deaths were elevated in 10 out of 11 occupations where the workers were exposed to ELF fields.
- In 1986, Dr. Bernard Tribukait, a professor of radio biology at the Karolinska Institute in Stockholm Sweden, reported that the fetuses of mice exposed to sawtooth electromagnetic fields had a greater incidence of congenital malformation than unexposed mice. The sawtooth waveform is a typical waveform generated by monitors and TV's.
- In 1988, the Maryland Department of Health and Hygiene found an unusually high rate of fatal brain cancer among men employed in electrical occupations.
- In 1989, John Hopkins University found an elevated risk of all cancers among New York Telephone Company cable splicers.
- In 1990, David Savitz, an epidemiologist at the University of North Carolina, determined through a study that pregnant woman who used electric blankets have children who have a 30% increased risk of cancer as compared to children whose mothers didn't use electric blankets.

**AR 0482**

Award-Winning Exposé

Home
Back
eMail Page
view clip
buy
more info
links



## PUBLIC EXPOSURE:
DNA, Democracy & the Wireless "Revolution"

Can microwaves alter our brains and DNA?
The first definitive, independently produced investigative
report on this key issue.

A 58-minute documentary on the human health dangers of Radio
Frequency Radiation (RFR)
from cell phones & cell towers... and what we can do to protect ourselves.

View 60-second preview on Google

Broadcast on Link TV
Official Screening - the WORLD SOCIAL FORUM
Porto Allegre, Brazil, 2003
*1st Prize Winner - EarthVision 2001 Film & Video Festival

A DVD of Public Exposure is $25.
A Briefing Kit of articles, research studies and charts on EMR health effects is $20.

To purchase click here for the EON Store.
You can also order via
phone - (415) 868-1900
e-mail - eon3@earthlink.net
check - EON, POB 1047, Bolinas, CA 94924
paypal via the button below



PUBLIC EXPOSURE brings you the scientific and political facts
the telecommunications industry doesn't want you to know.

PUBLIC EXPOSURE is a dramatic video report on cell phone
and cell tower microwave technology now proliferating
internationally, its sovering potential effects on human health and
democracy, and what citizens and responsible public officials
around the world are doing to respond.



PUBLIC EXPOSUREis the first independently produced
documentary to report on the growing scientific evidence and the
social movement pointing to the two main dangers from radiation
from the runaway "wireless revolution."
1) The serious potential public health hazards of radio frequency
radiation from wireless devices such as cell phones and the
antennas which broadcast the microwave signals and
2) the massive threat to democracy when millions of citizens are
forcibly exposed to radio frequency radiation (RFR) without their
consent and against their expressed will.
Respected Scientists are featured who have braved heavy-

**AR 0483**

handed telecom industry attempts at suppression of their findings, which show causal evidence of harm to biological systems from short term exposure to high levels of microwaves, such as from cell phones.

Studies also suggest chronic exposure to low levels of microwave radiation from antennas on cell towers may be equally harmful.


This is your child's brain on a cell phone.
Any questions?

PUBLIC EXPOSURE chronicles our growing potential danger from chronic exposures to low levels of ubiquitous manmade microwaves as the industry makes a wildcat stampede for quick profit without adequate understanding of these energies. In the past 100 years, public exposure to man-made radio frequency radiation has grown exponentially, particularly in the past decade. Telecommunication Industry projections are to completely cover the globe with these radiofrequency technologies.



There will be no where to escape. 25,000 additional cell phone users sign up daily and antennas from multiple commercial & government carriers blanket the countryside and cities.

Wireless transmission of internet data will exponentially increase the amount of microwave electro-smog we are all exposed to constantly.

Designed not only to inform, but to empower, PUBLIC EXPOSURE portrays the work for our democratic rights of national and international activists.



There are dramatic portraits of grassroots community activists in California and Colorado, Libby Kelley, Deb Carney and Francine Levien, actor Linda Evans, organizing in Washington, EMR specialist Cindy Sage and California Senator Tom Hayden who worked to sound the alarm, initiate responsible public policy, and to protect our democratic rights and process.

The international scope of the issue is seen through interviews with scientists and public health officials from New Zealand, Isreal, the U.S., Sweden and Austria. Researchers from over a dozen countries and activists from Europe and Japan assemble at an international conference in Salzberg, Austria in June, 2000. Their purpose: to work collectively to protect global democratic rights, public health and the planetary environment.



Electro-sensitivity (already officially estimated by Sweden's government at 2% of its population) is escalating worldwide with the wireless communication technology explosion. .

REPORTED BIO-EFFECTS OF LOW LEVEL RADIO FREQUENCY RADIATION (RFR) EXPOSURE: Infertility, childhood luekemia, adult luekemia, memory loss, lowered

**AR 0484**

reaction time; DNA damage; immune system effects; weakened
blood-brain barrier; sleep disorders.



PUBLIC EXPOSURE takes a cutting-edge look at the science,
the ec onomics, the politics and the potentially irreversible health
effects caused by this so-called 'revolution.'

PUBLIC EXPOSURE unfoldes through the indivvidual, local
stories of diverse scientists, acitvists and concerned public
decision-makers.

Below are some of the people you'll meet in the film and some
links to further imformation on this vital issue.

   

Actor LINDA EVANS campaigns nationally for citizens' democratic rights
over RFR. She tells how the Telecommunications Act of 1996, blocks
the right of democratic choice in the placement of cell phone towers.



Marketing executive MARK HART used this phone 8 hours a day. In
less than a year, he was diagnosed with cancer - a tennis-ball-sized
tumor in his brain. His dramatic story is told in PUBLIC EXPOSURE.



Senator Tom Hayden, California State Legislature
Fought to pass a bill to protect cell phone users. It was heavily opposed
by the telecommunications industry, but was just barely passed by the
Legislature, anyway.



Cindy Sage, Environmental Policy Consultant, California
An authority on EMR dangers and protections against them shows how
cell phones affect kids and why the 'precautionary principle' must be
used in deploying this technology.



Dr. Jerry Phillips: Research Biochemist, Colorado
His research showed negative human health effects from cell phones.
The industry tried to suppress it. He fought back.



Dr. John Goldsmith, Israel
An internattionally recognized EMR researcher tells how the Russians
discovered 'radiation sickness' and used it as a weapon against U.S.
diplomats. The U.S. government hushed it up.



**AR 0485**

Dr. Henry Lai: Research Professor, Bioengineering Dept., University of Washington, Seattle, WA. His research shows EMR caused unrepairable DNA breaks, and that long-term exposure to low radiation is as bad as short-term exposure to high radiation. The industry tried to suppress his findings, too.


Dr. Neal Cherry, Biophysicist, New Zealand
The late 'Paul Revere' of EMR dangers traveled the world blowing the whistle on telecommunications industry cover-ups of adverse human health effects from cell phone radiation.


Dr. Olle Johansson: Neuroscientist, Sweden's Karolinska Institute
A celebrated reshearcher who says, "All the evidence points, like trees in the wind, to severe human health dangers from proliferating cell phone technology.


Per Sagabeck: Senior Electronics Engineer at Erikkson, Sweden's leading cell phone company. Exposure has made him so 'electro-sensitive' he must wear a wire-mesh suit to go to work. The population of 'electro-sensitive' people in Sweden has skyrocked since the proliferation of cell phone and towers.






*Radiation Pattern of Cellular-Phone Towers*

For an in depth report on these issues see our white paper

Other sites where you can find information, support and friends.:

Citizens and professionals working for the safe use of electromagnetic technologies.

Microwave News covers the health and safety issues related to exposure to electromagnetic radiation.
Includes electromagnetic fields (EMFs) power lines, cellular phones and radar.

**AR 0486**

A national network of citizens and professionals for the responsible use of electromagnetic radiation.

EMF/RFR Bioeffects and Public Policy.

Your Ultimate Source for Electromagnetic Pollution Detectors, Shielding Devices and Protection Information.

Roy Beavers' website and news service is a vital infomation plexis point for our growing international movement

Community perspectives on Sutro Tower in San Francisco. This site is privately sponsored and not associated with Sturo Tower, Inc.

Colorado site with excellent information, including Lookout Mountain. (Lookout Mountain already exceeds FCC power limits, and broadcasters are pushing hard for more transmitters anyway.)

For those who read Swedish, a pioneer site for chemically and electromagnetically sensitive people.

Advancing sound public policy on EMR technology.



You can also order via
phone - (415) 868-1900

e-mail -
check - EON, POB 1047, Bolinas, CA 94924
paypal via the button below

AR 0487

April 17, 2006


Charles Macheers
Real Estate Manager II
6391 Sprint Parkway
MAILSTOP: KSOPHT0101-Z2650
OVERLAND PARK, KS 66251-2650

*RE:* Proposed Wireless Facilities at 1175 Palomar Drive, Redwood City (APN 051-416-040)

Dear Mr. Macheers,

The San Mateo County Planning and Building Division has retained MHA Environmental Consulting, Inc. (MHA) to assist in processing your application for a Use Permit Renewal for the retention of a wireless facility at 1175 Palomar Drive, Sprint Site ID: SF33XC598-B. Following a review of your file, we are requesting additional detailed information for clarification.

The following five items are required as part of two site plans prior to continuing the processing of your application. One site plan will include the first two items and will show the existing conditions. The second site plan will show the resulting plan if all applications are approved.

**Required Submittals**
1) **Existing Facilities.** A accurately scaled site plan will be prepared showing all existing facilities, buildings and property lines for the site.
2) **Existing Landscaping.** On the site plan, show the location of all trees on the property and state the species and condition of each. Identification of species and condition should be done by a licensed arborist.
3) **Proposed Relocation of Incorrectly Sited Antenna(e).** Clearly indicate on the site plan the location of those antenna(e) that are in violation of the requirements of Sprint's Use Permit and their proposed new location(s).
4) **Proposed Landscaping.** Show the location of all proposed landscaping, including the species, size at installation, and irrigation system.
5) **Proposed New Facilities.** Show the location of all proposed equipment.

Included in this letter is the contact information for Verizon and MetroPCS who also have open files for this location with the County at this time. We recommend that these requirements be fulfilled as a joint project between the current applicants as the requested maps must include facilities from all three as well as the existing T-Mobile facilities.

If you have any questions or comments, please call either me (650-373-1200) or Lisa Aozasa (County at 650-363-4852).


Sincerely,

**AR 0488**

Jennifer Cutler
Contract Planner

cc:    Lisa Aozasa, San Mateo County Planning Department
       Curtis Brooks, property owner
       Jane Weller, for Verizon Wireless
       Grant Willson, for MetroPCS
       Sprint Law Department

Enclosure

## APPLICANT CONTACT INFORMATION


### MetroPCS

Grant Willson
185 Berry Street, #5300
San Francisco, CA 94107

(415) 495-6273

County Case Number PLN2005-00261

MetroPCS Site #SF09041A


### Verizon Wireless

Jane Weller
Peacock Associates, Inc. (on behalf of Verizon Wireless)
5855 Doyle Street, Suite 108
Emeryville, CA 94608

(510) 420-5701

County Case Number PLN2005-00306

Verizon Wireless Site ID: #123279 – Edgewood & Crestview


### Sprint

Charles Macheers
Real Estate Manager II
6391 Sprint Parkway
MAILSTOP: KSOPHT0101-Z2650
OVERLAND PARK, KS 66251-2650

(913) 794-5677

County Case Number PLN2005-00306

SPRINT SITE ID: SF33XC598-B


Send also to:

Sprint Law Department
Attn: Sprint PCS Real Estate Attorney
6391 Sprint Parkway
MAILSTOP: KSOPHT0101-Z2020
OVERLAND PARK, KS 66251-2020


**AR 0490**

## Sprint PCS • Proposed Base Station (Site No. SF33xc598C)
## 1175 Palomar Drive • Redwood City, California

### Statement of Hammett & Edison, Inc., Consulting Engineers

The firm of Hammett & Edison, Inc., Consulting Engineers, has been retained on behalf of Sprint PCS, a wireless telecommunications carrier, to evaluate the proposed PCS base station facilities to be located at 1175 Palomar Drive in Redwood City, California (Site No. SF33xc598C), for compliance with appropriate guidelines limiting human exposure to radio frequency electromagnetic fields.

### Prevailing Exposure Standards

The U.S. Congress requires that the Federal Communications Commission ("FCC") evaluate its actions for possible significant impact on the environment. In Docket 93-62, effective October 15, 1997, the FCC adopted the human exposure limits for field strength and power density recommended in Report No. 86, "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," published in 1986 by the Congressionally chartered National Council on Radiation Protection and Measurements ("NCRP"). A summary of the exposure limits contained in NCRP-86 is shown in Figure 1. Separate limits apply for occupational and public exposure conditions, with the latter limits generally five times more restrictive. The more recent Institute of Electrical and Electronics Engineers ("IEEE") Standard C95.1-1999, "Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," includes nearly identical exposure limits. These limits apply for continuous exposures and are intended to provide a prudent margin of safety for all persons, regardless of age, gender, size, or health.

The most restrictive thresholds for exposures of unlimited duration to radio frequency ("RF") energy for several personal wireless services are as follows:

| Wireless Telecommunications Service | Operating Frequency | Occupational Limit | Public Limit |
|---|---|---|---|
| Personal Communication ("PCS") | 1,900 MHz | 5.0 mW/cm$^2$ | 1.0 mW/cm$^2$ |
| Cellular Telephone | 870 | 2.90 | 0.58 |
| Specialized Mobile Radio | 855 | 2.85 | 0.57 |
| [most restrictive frequency range] | 30–300 | 1.0 | 0.20 |

### General Facility Requirements

Base stations typically consist of two distinct parts: the electronic transceivers (also called "radios" or "cabinets") that are connected to the traditional wired telephone lines, and the passive antennas that send the wireless signals created by the radios out to be received by individual subscriber units. The transceivers are often located at ground level and are connected to the antennas by coaxial cables about 1 inch thick. Because of the short wavelength of the frequencies assigned by the FCC for wireless services, the antennas require line-of-sight paths for



HAMMETT & EDISON, INC.
CONSULTING ENGINEERS
SAN FRANCISCO

**AR 0491**

970117-598C
Page 1 of 3

## Sprint PCS • Proposed Base Station (Site No. SF33xc598C)
### 1175 Palomar Drive • Redwood City, California

their signals to propagate well and so are installed at some height above ground. The antennas are designed to concentrate their energy toward the horizon, with very little energy wasted toward the sky or the ground. Along with the low power of such facilities, this means that it is generally not possible for exposure conditions to approach the maximum permissible exposure limits without being physically very near the antennas.

### Computer Modeling Method

The FCC provides direction for determining compliance in its Office of Engineering and Technology Bulletin No. 65, "Evaluating Compliance with FCC-Specified Guidelines for Human Exposure to Radio Frequency Radiation," dated August 1997. Figure 2 attached describes the calculation methodology, which reflects the fact that the power level from an energy source decreases with the square of the distance from the source (the "inverse square law"). The computerized technique for modeling particular sites is also described, and the conservative nature of this method for evaluating expected exposure conditions has been verified by numerous field tests.

### Site and Facility Description

Based upon information provided by Sprint, including zoning drawings by Alvar Architects, Inc., dated September 29, 2000, it is proposed to mount three EMS Model FR9016-DP directional panel antennas on new 13-foot poles near the top of the hill behind the residence located at 1175 Palomar Drive in Redwood City. Two antennas, oriented toward 130°T and 220°T with 4° down tilt, would be mounted on one pole about 75 feet to the south of the highest point, while the third antenna, oriented toward 340°T with 2° down tilt, would be mounted on a pole about 18 feet southwest of that point. The antennas would be mounted at an effective height of 13 feet above ground, and the maximum effective radiated power in any direction would be 1,000 watts. There are no other wireless telecommunications facilities located nearby.

### Study Results

The maximum ambient RF level anywhere at ground level due to the proposed operation is calculated to be 0.074 mW/cm$^2$, which is 7.4% of the applicable public exposure limit. It should be noted that this result includes several "worst-case" assumptions and therefore is expected to overstate actual power density levels.

### Recommended Mitigation Measures

Since they are to be mounted above the reach of persons on the ground, the Sprint antennas are not accessible to the general public, and so no mitigation measures are necessary to comply with the



HAMMETT & EDISON, INC.
CONSULTING ENGINEERS
SAN FRANCISCO

**AR 0492**

## Sprint PCS • Proposed Base Station (Site No. SF33xc598C)
### 1175 Palomar Drive • Redwood City, California

FCC public exposure guidelines. To prevent exposures in excess of the FCC occupational guidelines, no access within $8^1/2$ feet in front of the antennas themselves, such as might occur with the use of ladders, should be allowed while the site is in operation, unless other measures can be demonstrated to ensure that occupational protection requirements are met. Posting explanatory warning signs* at the base of the poles, such that the signs would be readily visible from any angle of approach to persons who might need to work within that distance, would be sufficient to meet FCC-adopted guidelines.

## Conclusion

Based on the information and analysis above, it is the undersigned's professional opinion that the base station proposed by Sprint at 1175 Palomar Drive in Redwood City, California, can comply with the prevailing standards for limiting human exposure to radio frequency energy and, therefore, need not for this reason cause a significant impact on the environment. The highest calculated level in publicly accessible areas is much less than the prevailing standards allow for exposures of unlimited duration. This finding is consistent with measurements of actual exposure conditions taken at other operating base stations.

## Authorship

The undersigned author of this statement is a qualified Professional Engineer, holding California Registration Nos. E-13026 and M-20676, which expire on June 30, 2001. This work has been carried out by him or under his direction, and all statements are true and correct of his own knowledge except, where noted, when data has been supplied by others, which data he believes to be correct.



William F. Hammett, P.E.

March 30, 2001

---

\* Warning signs should comply with ANSI C95.2 color, symbol, and content conventions. In addition, contact information should be provided (*e.g.*, a telephone number) to arrange for access to restricted areas. The selection of language(s) is not an engineering matter, and guidance from the landlord, local zoning or health authority, or appropriate professionals may be required.

**HAMMETT & EDISON, INC.**
CONSULTING ENGINEERS
SAN FRANCISCO

**AR 0493**

## National Council on Radiation Protection and Measurements

### Report No. 86 (Published 1986)
### "Biological Effects and Exposure Criteria
### for Radiofrequency Electromagnetic Fields"

### Radio Frequency Protection Guide

| Frequency | Electromagnetic Fields | | | | | | Contact Currents |
|---|---|---|---|---|---|---|---|
| Applicable Range (MHz) | Electric Field Strength (V/m) | | Magnetic Field Strength (A/m) | | Equivalent Far-Field Power Density (mW/cm²) | | (mA) |
| 0.3 – 1.34 | 614 | *614* | 1.63 | *1.63* | 100 | *100* | 200 |
| 1.34 – 3.0 | 614 | *823.8/f* | 1.63 | *2.19/f* | 100 | *180/f²* | 200 |
| 3.0 – 30 | 1842/f | *823.8/f* | 4.89/f | *2.19/f* | 900/f² | *180/f²* | 200 |
| 30 – 300 | 61.4 | *27.5* | 0.163 | *0.0729* | 1.0 | *0.2* | no limit |
| 300 – 1,500 | 3.54√f̄ | *1.59√f̄* | √f̄/106 | *√f̄/238* | f/300 | *f/1500* | no limit |
| 1,500 – 100,000 | 137 | *61.4* | 0.364 | *0.163* | 5.0 | *1.0* | no limit |

Note: f is frequency of emission, in MHz.





HAMMETT & EDISON, INC.
CONSULTING ENGINEERS
SAN FRANCISCO

AR 0494

NCRP-86 Standard
Figure 1

## RFR.GROUND™ Calculation Methodology
### Determination by Computer
### of Compliance with Human Exposure Limitations

The U.S. Congress requires that the Federal Communications Commission ("FCC") evaluate its actions for possible significant impact on the environment. In Docket 93-62, effective October 15, 1997, the FCC adopted the human exposure limits for field strength and power density recommended in Report No. 86, "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," published in 1986 by the Congressionally chartered National Council on Radiation Protection and Measurements ("NCRP"). Separate limits apply for occupational and public exposure conditions, with the latter limits generally five times more restrictive. The more recent Institute of Electrical and Electronics Engineers ("IEEE") Standard C95.1-1999, "Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," includes nearly identical exposure limits. These limits apply for continuous exposures from all sources and are intended to provide a prudent margin of safety for all persons, regardless of age, gender, size, or health. Higher levels are allowed for short periods of time, such that total exposure levels averaged over six or thirty minutes, for occupational or public settings, respectively, do not exceed the limits.

The FCC Office of Engineering and Technology Bulletin No. 65 (August 1997) gives the formula for calculating power density from an individual radiation source:

$$\text{power density} \quad S = \frac{2.56 \times 1.64 \times 100 \times RFF^2 \times [VERP + AERP]}{4\pi D^2}, \text{ in mW/cm}^2,$$

where $VERP$ = $0.4 \times$ total peak visual ERP (all polarizations), in kilowatts for NTSC,
   = average power (all polarizations), in kilowatts for DTV,

   $AERP$ = total aural ERP (all polarizations), in kilowatts,

   $RFF$ = relative field factor at the direction to the actual point of calculation, and

   $D$ = distance from the center of radiation to the point of calculation, in meters.

The factor of 2.56 accounts for the increase in power density due to ground reflection, assuming a reflection coefficient of 1.6 ($1.6 \times 1.6 = 2.56$). The factor of 1.64 is the gain of a half-wave dipole relative to an isotropic radiator. The factor of 0.4 converts NTSC peak visual ERP to an average RMS value; for FM, cellular, and PCS stations, of course, the value of VERP is zero. The factor of 100 in the numerator converts to the desired units of power density.

This formula has been built into a computer program by Hammett & Edison that calculates, at each location on an arbitrary rectangular grid, the total expected power density from any number of individual radiation sources. The program also allows for the description of the actual terrain at the site to obtain more accurate projections.

HAMMETT & EDISON, INC.
CONSULTING ENGINEERS
SAN FRANCISCO

AR 0495

Methodology
Figure 2

**County of San Mateo**
**Environmental Services Agency**
**Planning and Building Division**

## APPLICATION REVIEW AND IN-PROCESSING CHECKLIST

1. Owner: _Curtis Brooks_         Applicant: _Sprint/Nextel_

2. Project Site Address: _1175 Palomar Drive, Redwood City_

3. APN(s): _051-416-040_

4. Project Description: _Use Permit Renewal Cell Site_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5. Planning Permit Case No.:              7.  Building Permit Case No.:

    _PLN2000-00497_

6. Environmental Review:

   a.   Cat. Ex.   ☐ Yes   ☐ No

   b.   Neg. Dec.  ☐ Yes   ☐ No

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

8. Public Hearing required:  Yes _X_         No _____

9. Decision Maker:

    Planning Director      _____         Zoning Hearing Officer      _____
    Planning Commission    _____         Design Review Committee     _____
    Board of Supervisors   _____

10. Complete Plan Check Checklist.

11. Complete Permit*Plan entries.

12. Collect Planning and applicable Environmental Health and CDF fees; attach receipt.

13. Application received by: _JAK_         Date: _2/23/06_

14. Planner Assigned: _MHA consultant_   By: _MJS_   Date: _3/2/06_

### TRANSFER APPLICATION MATERIALS TO RECEPTIONIST

- - - - - - - - - - - - - - - - over - - - - - - - **AR 0496** - - - - - -

15. Prepare Referral Sheets for applicable projects.

16. Prepare File Label (right edge of file tab).

> <u>Planning File No.</u>_____
> Owner/Applicant

> Example   <u>PLN 1999-00015</u>_____
> Smith/Jones

17. Complete Planning Permit Information Sheet.

18. Insert File Contents (in top to bottom order).

<u>Front Cover</u>

_____    Planning Permit Info. Sheet

<u>Inside Front Cover</u>

_____    Post Approval Card

_____    Permit Processing Checklist

<u>Inside Back Cover</u>

_____    In-Processing Form

_____    Project Referral Sheets

_____    Plan Check Checklist

_____    Application Forms

_____    EIF

_____    Supporting Documents

_____    Graphics, Transparencies

_____    Owner's Authorization

_____    Proof of Owner's Interest

_____    Receipt for Fees

_____    _____

_____    _____

### TRANSFER FILE TO SENIOR PLANNER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

19. Add applicable projects to Development Review Committee agenda log.

20. Mail Acknowledgment Post Card indicating Project File Number(s) and Assigned Planner.

21. Complete Permit*Plan entries.

### TRANSFER FILE TO ASSIGNED PLANNER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FRM00047.WP6 (1/20/99)

**AR 0497**



**Sprint**
Together with NEXTEL

Sprint Nextel
6391 Sprint Parkway
MAILSTOP: KSOPHT0101-Z2650
Overland Park, KS 66251-2650
Office: (913) 794-5677 Fax: (913) 794-0824
charles.w.macheers@sprint.com

Charles Macheers
Lease Specialist II

February 20, 2006

VIA DHL EXPRESS
Tracking #   9 6 7 4 2 30448/

Planning and Building Division
Attn: Permit Renewal Coordinator
County Government Center
455 County Center, 2nd Floor
Redwood City, CA  94063

> **RE:  Permit No. PLN2000-00497  APN: 051-416-040**
> Sprint Site ID:  SF33XC598-B
> Site Address:  1175 Palomar Drive, Redwood City, CA

Dear Sir:

Please find enclosed the Planning Permit Application renewal Form, Companion Page, Environmental Information & Hazardous Waste Site Disclosure Form, and check no. 0013245142 in the amount of $4,195.60 for the site referenced above.  Please let me know if you need additional information.

Please be advised that all notices should be delivered to Sprint at the address found at the top of this letter, with a copy to the Sprint Law Department, Attention: Sprint PCS Real Estate Attorney, Mailstop: KSOPHT0101-Z2020, 6391 Sprint Parkway, Overland Park, KS 66251-2020.  Should you have any questions, please do not hesitate to contact our toll free Hotline at 800-357-7641.   When calling please have the Sprint Site ID (above) available for reference.  Thank you.

Should you have any questions, please do not hesitate to contact me at 913-794-5677 or our toll free Hotline at 800-357-7641.  Thank you.

Sincerely,

Charles Macheers
Real Estate Manager II

Enclosures

SAN MATEO COUNTY
PLANNING DIVISION

2006 FEB 21  P 3 00

RECEIVED

**AR  0498**

**San Mateo County Environmental Services Agency**

**Planning and Building Division**

455 County Center • Redwood City CA 94063
(650) 363-4161 • FAX (650) 363-4849

# Planning Permit
# Application Form

Permit Numbers
Primary: _PLN 2000-00497_

_SF 33XC598-B_

## Applicant/Owner Information

Applicant: _Sprint Spectrum L.P. Site no. SF33XC598-B, park, KS_

Mailing Address: _Mailstop: KSO PHT0101-Z 2650, 6391 Sprint Parkway, overland   Zip: 66251-2650_

Phone, W: _800-357-7641_   H: _____   FAX: _913-794-0824_

Name of Owner (1): _Curtis Brooks_

Mailing Address: _1175 Palomar Drive_

_Redwood City, CA_   Zip: _94062_

Phone, W: _____

H: _____

Name of Owner (2): _____

Mailing Address: _____

Zip: _____

Phone, W: _____

H: _____

## Project Information

**Project Location** (address): _1175 Palomar_
_Drive, Redwood City._

**Zoning:** _R-1, Slot_

**Assessor's Parcel Numbers:**
_051-416-040._

**Parcel/lot size:** _350 sq. ft. lease area_

List all elements of proposed project: _Use Permit Renewal. Placement of 2 15ft. Monopoles_
_& one equipment enclosure in unincorporated Palomar Park._
_Lease parcel 350 sq. ft._

List any other permits or approvals already obtained for this project (include date, agency and application/permit numbers):

## Signatures

We hereby certify that the information stated above and on forms, plans and other materials submitted herewith in support of the application is true and correct to the best of our knowledge. It is our responsibility to inform the County of San Mateo through our assigned project planner of any changes to information represented in these submittals.

Owner's signature: _____

**AR 0499**

Owner's signature: _____

Applicant's signature: _Sprint Spectrum L.P. by_
_Contracts & Performance (illegible), Real Estate Manager II_

# Planning Permit Application Check List

This form filled out by **Staff Only**     Primary Permit No.: _____

| Planning Approvals Required | Survey ❸ | Application Page | Proof of Ownership (Deed or Tax Bill) | Grant Deed | Owner's Concurrence | Chain of Title | Title Report (within past 2 mo.) | Environmental Information Form | Tentative Map ❷ | Density Analysis/Certification | Ag. Land Mgmt. Plan ❶ | Grading Plans ❶ | Geotechnical Report | Erosion/Sediment Control | Dust Control Plan | Permanent Storm Water Controls | Manure Management Plan | Supporting Statements | Location Map ❶ | Site Plans ❶ | Elevation Plans ❶ | Floor Plans ❶ | Plan Reductions (8.5" x 11") | Other | Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Agricultural Preserve | | ✓ | ✓ | | ✓ | | ✓ | ✓ | | | | | | | | | | | ✓ | ✓ | | | | | |
| Architectural Review | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Architectural Review Exemption | | | ✓ | | ✓ | | | ✓ | | | | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Certificate of Compliance - Type A | | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | | | | | | | | ✓ | | | | | | |
| Certificate of Compliance - Type B | | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | | | | | | | | | | | ✓ | | | | | | |
| Coastal Development | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | ✓ | | | ✓ | ✓ | ✓ | ✓ | | | |
| Coastal Development Exemption | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | | | ✓ | ✓ | | | | | |
| Major Development Review | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Confined Animal Permit or Exempt. | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | | |
| Design Review | ✓ | ✓ | ✓ | | ✓ | | | | | ✓ | | | | ✓ | | ✓ | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Drilling - Oil & Gas | | ✓ | ✓ | | ✓ | | | | | | | | | ✓ | | ✓ | | | ✓ | ✓ | | ✓ | ✓ | | |
| General Plan Amendment | ❻ | ✓ | ✓ | | ✓ | | | | | | | | | ✓ | | | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | |
| Grading | | ✓ | ✓ | | ✓ | | | ✓ | | | | ✓ | ✓ | ✓ | ✓ | | | | ✓ | ✓ | | | ❺ | | |
| Grading Exemption | | ✓ | ✓ | | | | | | | | | ✓ | | | | | | | ✓ | ✓ | | | ❺ | ✓ | |
| Home Improvement Exception | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Kennel/Cattery | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | ✓ | | | | | ✓ | ✓ | | | ✓ | | |
| Lot Line Adjustment | | ✓ | ✓ | | ✓ | | ✓ | | | | ✓ | | | | | | | ✓ | ✓ | ✓ | | | ✓ | | |
| Merger | | | | ✓ | ✓ | | | | | | | | | | | | | | ✓ | | | | | | |
| Off-Street Parking Exception | ✓ | ✓ | ✓ | | ✓ | | | | | | | | | | | | | | ✓ | ✓ | | | | | |
| Planned Agriculture | | ✓ | ✓ | | ✓ | | ✓ | | | | ✓ | | | | | | | | ✓ | ✓ | | | ✓ | | |
| Resource Management | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | | | ✓ | | | ✓ | | ✓ | | | ✓ | ✓ | | | | ✓ | |
| Rezoning | | ✓ | ✓ | | ✓ | | | ✓ | | | | | | | | | | | ✓ | ✓ | | | | | |
| Street Name/Change | | ✓ | ✓ | | | | | | | | | | | | | | | | ✓ | ✓ | | | | | |
| Subdivision | | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | | | | | | | | | | ✓ | ✓ | | | ✓ | | |
| Surface Mining | | ✓ | ✓ | | ✓ | | ✓ | | | | | | | | | | | | ✓ | ✓ | | | | | |
| Timberland Preserve | ✓ | ✓ | ✓ | | ✓ | | ✓ | | | | | | | | | | | | ✓ | ✓ | | ✓ | | | |
| Use Permit | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | | | | | | ✓ | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Variance | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | | | | | | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Other ❸ | | | | | | | | | | | | | | | | | | | | | | | | | |

Fees: CEQA: _____  Health: _____  CDF: _____

Other Fees _____
Total Fees _____

AR 0500

❶ = 5 sets of all plans (folded
❷ = 2 copies of Subdivision Maps (folded to 8½ x 11")
❸ = GPC, Text Amend., Timber Harvest, Topsoil, etc.

❹ = Needed only if a public hearing is required
❺ = Required if property is 20 acres or more.
❻ = Partial or full boundary and/or topographical survey may be required.

vpdata/ck/permitblk.vp ss rev 4/21/04 ss

San Mateo County Environmental Services Agency

# Application for a Use Permit

## Companion Page

Planning and Building Division

455 County Center, 2nd Floor Redwood City • CA • 94063
Mail Drop PLN 122 • Phone: 650 • 363 • 4161  Fax: 650 • 363 • 4849

Applicant's Name: Sprint Spectrum h.P.

Primary Permit #: PLN 2000 - 00497

SF 33XC 598 - B

## 1. Instructions

Please fill out the general Planning Permit Application Form and this form when applying for a Use Permit. You must also submit all items indicated on the checklist found on the reverse side of the Planning Permit Application Form.

## 2. Project Information

This application is for:   ☐ Initial Use Permit

☑ Renewal or Administrative Review of Existing Use Permit    ☐ Amendment to an Existing Use Permit
Original Permit #: PLN 2000 - 00497                Original Permit #:_____

If an initial permit, please describe specifics of proposed operation (ie. hours of business, number of employees, activities, etc.). If an amendment to an existing permit, please describe the specific proposed changes in the operation.

## 3. Required Finding

To approve this application, the County must determine that this project complies with all applicable regulations including the following specifically required finding:

**That the establishment, maintenance and/or conducting of the use will not, under the circumstances of the particular case, be detrimental to the public welfare or injurious to property or improvements in the neighborhood.**

Write a brief statement in which you present evidence to support the required finding.

this is an unmanned cellular
facility consisting of 2 15 ft.
monopoles & one equipment
cabinet enclosure. Approx 350
Sq. ft. lease area located

at 1175 Palomar Drive in the
unincorporated Palomar Park.
To our knowledge the site complies
with all applicable codes &
regulations, and in harmony with
the surrounding neighborhood

**AR 0501**

pub. info\vndata\20apps\22027 vp rls 2/13/03

Case 4:08-cv-00342-CW    Document 31-12    Filed 07/21/2008    Page 62 of 63



SOUTHWEST ELEVATION

NORTHWEST ELEVATION

AR 0502



AR 0503